Michael R. HARRIS, Plaintiff,

v.

Donald J. CARTER, Frederic E. Mascolo, Robert Lee Ager, Tom Devaney, Jean Demunck, Paul Johnson, Frank Jeffett, Murphy Martin, William J. Hendrix and Atlas Energy Corporation, Defendants.

Civ. A. No. 8768.

Court of Chancery of Delaware, New Castle County.

Submitted: Feb. 3, 1989.
Decided: May 4, 1990.

 

Norman M. Monhait, and Robert Bria, of Morris, Rosenthal, Monhait & Gross, P.A., Wilmington, for plaintiff.

Mary B. Graham, and Richard D. Allen, of Morris, Nichols, Arsht & Tunnell, Wilmington, for defendants Donald J. Carter, Frank Jeffett, Murphy Martin and William J. Hendrix.

Steven D. Goldberg, of Theisen, Lank, Mulford & Goldberg, Wilmington, for defendants Tom Devaney and Atlas Energy Corp.

Judith Nichols Renzulli, David B. Ripsom, John L. Olsen, and Thomas P. Preston, of Duane Morris & Heckscher, Wilmington, for defendant Frederic E. Mascolo.

## OPINION

ALLEN, Chancellor.

Two distinct groups of defendants have moved to dismiss the Amended and Supplemental Complaint in this action, ("amended complaint"). They assert (1) that the action was not properly instituted as the derivative action it purports to be (2) that the amended complaint does not state a claim upon which relief may be granted and (3) with respect to certain defendants, that the court lacks personal jurisdiction over them.

Certain of the legal issues presented are novel questions under our law and they arise in a case of some factual and procedural complexity.

For the reasons that follow I conclude that the relevant pleadings excuse pre-suit demand upon the board of directors of Atlas Energy Corporation, the corporation on whose behalf the amended complaint is said to be filed. Thus I conclude that the motion to dismiss for failure to comply with the requisite of Rule 23.1 must be denied (*see* pp. 228–232). I conclude as well that the amended complaint does state a claim upon which relief may be granted against those defendants who are alleged to have negligently sold control of Atlas to a buyer who allegedly looted the corporation (*see* pp. 232–236). Lastly I conclude that all defendants have properly been served with process pursuant to our director consent statute, 10 *Del.C.* § 3114, and thus the motion to dismiss for want of personal jurisdiction should be denied (*see* p. 232).

The litigation arises from the negotiation and sale by one group of defendants (the Carter group [1]) of a control block of Atlas stock to Frederic Mascolo; the resignation of the Carter group as directors and the appointment of the Mascolo defendants [2] as

---

1. That group includes defendants Carter, Jeffett, Hendrix, and Martin. Each were directors of Atlas and each resigned following the sale by Carter and his associates of their Atlas stock to Mascolo. Mr. Hendrix himself owned no Atlas stock.

2. As used in this opinion the "Mascolo defendants" refers principally to defendants Mascolo and Ager, and more peripherally to Messrs.

Johnson, Demunck and Devaney. Messrs. Johnson and Demunck have not answered the complaint. Mr. Devaney has not moved to dismiss. These three defendants appear from the complaint to be pawns in the scheme of Mascolo, Ager and others. The "Mascolo group" refers to Messrs. Mascolo, Ager and their non-defendant co-conspirators.

directors of Atlas, and, finally, the alleged looting of Atlas by Mascolo and persons associated with him. Insofar as the Carter defendants are concerned it is alleged that they were negligent and that their negligence breached a duty that, in the circumstances, they owed to the corporation. It is not claimed that they stand as an insurer of the corporation generally, but that the specific circumstances of their sale of control should have raised a warning that Mascolo was dishonest. The claims against Mascolo are more conventional: effectuation of self-dealing transactions on unfair terms. The Mascolo group is principally Messrs. Mascolo and Ager. They are two of the four alleged co-conspirators who orchestrated the wrongs alleged. The other two named co-conspirators—a convicted felon named Riefler and a lawyer named Beall—were not named as defendants since they are not amenable to service of process in the jurisdiction.

### Procedural History

Plaintiff is a minority shareholder of Atlas. He brought this action after the change in control from the Carter group to the Mascolo group had occurred. The action was brought originally as a class action to enjoin a transaction that plaintiff alleged would constitute a breach of the directors' fiduciary duty; to rescind certain transactions effected by the Mascolo group; and, to collect damages from the Mascolo group. In addition the original complaint sought to collect damages from the Carter defendants for an alleged breach of a duty of care to minority shareholders in connection with the sale of control of Atlas to Mascolo.

The transaction that was sought to be enjoined in the original pleading was abandoned without any judicial action. Thereafter, following discovery, plaintiff filed the amended complaint. The amended complaint for the first time purported to assert claims derivatively on behalf of Atlas.

In general the claims asserted against the Carter group in the amended complaint are of two types. More significantly it is alleged that the Carter group, *qua* shareholders, owed a duty of care to Atlas to take the steps that a reasonable person would take in the circumstances to investigate the *bona fides* of the person to whom they sold control.[3] It is said that the duty was breached here, and that if it had been met the corporation would have been spared the losses that are alleged to have resulted from the transactions effected by the board under the domination of Mascolo. There is no allegation that the Carter group conspired with Mascolo. Indeed the Carter group did not sell for cash but for shares of common stock of a corporation that plaintiff claims was a worthless shell and which was later employed in the transactions that are said to constitute a looting of Atlas. Thus, accepting the allegations of the complaint, they suggest that the Carter group was misled to its own injury as well as the injury of Atlas and its other shareholders. This claim was set forth, albeit as a direct claim and perhaps less elaborately, in the original pleading.

The second claim against the Carter defendants relates to a $100,000 payment made by Atlas after the change in control. It is alleged this amount was paid to a broker who acted for the Carter group in connection with the sale of its Atlas stock. It is thus said to constitute a corporate waste.[4]

With respect to the second group of defendants—the Mascolo defendants—the amended complaint alleges a series of complex corporate transactions effectuated once Mascolo took control of Atlas, and claims that those transactions wrongfully injured Atlas (*see* p. 226 *infra*).

The amended complaint alleges that demand upon the board of directors pursuant

---

**3.** Carter owned 46% of Atlas' stock and the Carter group as a whole owned 52% of the Atlas stock. Several individuals designated in the amended complaint as members of the Carter group are not named as defendants.

**4.** This claim is also asserted against the Mascolo group. The Carter defendants are alleged to have participated in the corporate waste resulting from the $100,000 payment.

to Rule 23.1 of our rules of procedure is excused in this instance because:

> Atlas' directors *at the time this action was instituted* were neither disinterested nor independent. They were all nominees of the Mascolo group.

It alleges that following the filing of the original complaint Mascolo "transferred [his] Atlas stock to [one] Devaney ... placing Devaney and/or his nominees in control of Atlas" ¶ 32(a). It does appear to allege that Devaney later caused a self-dealing transaction to be done,[5] but does not allege that it was on terms that were unfair to the corporation. Thus the pleadings refer to a change in board control between the date of the filing of the original complaint and the date of the filing of the amended complaint. Moreover, the amended complaint contains no allegations that demand on the new (Devaney controlled) board would be futile.

The amended complaint seeks appointment of a receiver, rescission, and damages.

## I.

The facts as alleged are involved. As alleged they appear as follows.

### The Company

Atlas Energy Corporation is a Delaware corporation which, before Mascolo acquired control of it, engaged in oil and gas exploration and production. It conducted its business primarily through the acquisition of oil and gas properties which were resold to drilling programs. It then acted as sponsor and general partner of the drilling programs.

### The Stock Exchange Agreement

The Carter group, which collectively owned 52% of the stock of Atlas, and Mascolo entered into a Stock Exchange Agreement dated as of March 28, 1986. That agreement provided that the Carter group would exchange its Atlas stock for shares of stock held by Mascolo in a company called Insuranshares of America ("ISA")

and contemplated a later merger between ISA and Atlas. ISA was described in the preamble to the Stock Exchange Agreement as "a company engaged in the insurance field by and through wholly-owned subsidiaries." The Stock Exchange Agreement contained representations and warranties by Mascolo to the effect that ISA owned all of the issued and outstanding capital stock of Pioneer National Life Insurance Company and Western National Life Insurance Company. It is alleged that those representations were false. ISA did not own stock in either company and had no insurance subsidiaries.

In the course of negotiations, the Mascolo group furnished the Carter group with a draft financial statement of ISA that reflected an investment in Life Insurance Company of America, a Washington corporation ("LICA"). No representation concerning LICA was made in the Stock Exchange Agreement, however. The existence of a purported investment by ISA in LICA was fictitious. It is alleged that the draft ISA financial statement was sufficiently suspicious to put any reasonably prudent business person on notice that further investigation should be made. Indeed Atlas' chief financial officer analyzed the financial statement and raised several questions concerning its accuracy, none of which were pursued by the Carter group.

The Stock Exchange Agreement further provided that Mascolo would place in escrow 50,000 shares of Louisiana Bankshares Inc. 8% cumulative preferred stock, $10 par value. It was agreed that if Atlas consummated an exchange merger for all of the outstanding common stock of ISA on agreed upon terms within 365 days of the date of the Stock Exchange Agreement, the bank stock would be returned to Mascolo. If no merger took place within the specified time, then that stock was to be distributed *pro rata* to the Carter group members.

It was agreed, finally, that as part of the stock exchange transaction, the members of the Carter group would resign their positions as Atlas directors in a procedure

---

**5.** That is rescission of the MPA transaction. *See* p. 227 *infra*.

that assured that Mascolo and his designees would be appointed as replacements.

The gist of plaintiff's claim against the Carter defendants is the allegation that those defendants had reason to suspect the integrity of the Mascolo group, but failed to conduct even a cursory investigation into any of several suspicious aspects of the transaction: the unaudited financial statement, the mention of LICA in negotiations but not in the representations concerning ISA's subsidiaries, and the ownership of the subsidiaries themselves.[6] Such an investigation, argues plaintiff, would have revealed the structure of ISA to be fragile indeed, with minimal capitalization and no productive assets.

\* \* \*

The charges against the Mascolo defendants are that the Mascolo defendants caused the effectuation of self-dealing transactions designed to benefit members of the Mascolo group, at the expense of Atlas.

Mascolo purchased the Carter group's stock on March 28, 1986. Also on that day the newly elected Atlas board (*i.e.*, the Mascolo defendants) adopted resolutions that, among other things:[7]

(a) changed Atlas' name to Insuranshares of America, Inc.;[8]

(b) effectuated a reverse stock split converting each existing Atlas share into .037245092 new shares, thus reducing the 26,849,175 Atlas shares to approximately 1,000,000 shares;

(c) reduced Atlas authorized capitalization to 10,000,000 shares, $.10 par value;

(d) approved the acquisition of all of the outstanding common stock of ISA in consideration for 3,000,000 post-reverse stock split Atlas shares;

(e) elected defendant Mascolo as chairman of the board, Johnson as president, Devaney as treasurer and Ager as vice president;

(f) approved the negotiation of the sale of Atlas' oil properties "with a series of potential buyers";

(g) approved the purchase of 200,000 shares of the common stock of Hughes Chemical Corporation at $3 per share with an option to acquire an additional 1,000,000 shares at $5 per share for a 12–month period and for $10 per share for a consecutive 12–month period;

(h) ratified the actions of the company's prior officers and directors and released them from any liability arising as a consequence of their relationship to the company; and

(i) authorized payment of a $100,000 commission to the company which found the buyers of the Carter group stock.

It is alleged, essentially, that defendants Devaney, Demunck, and Johnson approved the ISA and Hughes chemical transactions without any credible information about the business or assets of either of those companies. Messrs. Mascolo and Ager, it is alleged, knew of the poor financial condition of ISA and Hughes Chemical and fraudulently approved the challenged transaction. Each Mascolo defendant is charged with breach of fiduciary duty in connection with the approval of the payment of a finder's fee in connection with the Stock Exchange Agreement.

## The ISA Transaction

Plaintiff asserts that ISA is nothing more than a corporate shell. Pursuant to the Stock Exchange Agreement Mascolo acquired a controlling (52%) stock interest in Atlas in exchange for 518,335 ISA shares. Atlas then acquired all the outstanding ISA shares in exchange for 3,000,000 newly issued shares of Atlas common stock. As a result of that transaction, the Mascolo group as a whole came to own 75% of Atlas' shares. The minority shareholders of Atlas saw their proportionate ownership of Atlas reduced from 48% before the

---

6. Plaintiff also charges that Atlas' payment of a finder's fee in connection with the sale of the Carter group stock constituted a waste of assets in which the Carter defendants participated.

7. The following day Mascolo, as holder of a majority of Atlas' shares, executed a written consent ratifying the board resolutions.

8. The name was changed back to Atlas in June, 1987.

ISA transaction to 12% upon its consummation.[9] For Atlas to exchange 3,000,000 of its shares for the stock of this "corporate shell" was, argues plaintiff, equivalent to issuing Atlas stock to the Mascolo group (the holders of the ISA stock) without consideration.

### The Hughes Chemical Purchase

Hughes Chemical Corporation is a North Carolina corporation with its sole place of operations in Fletcher, North Carolina. Mr. Mascolo and two of his associates (who are referred to in the amended complaint as members of the Mascolo group but who are not named as defendants) were stockholders and directors of Hughes Chemical. Plaintiff asserts that in March, 1986, Mascolo caused Atlas to acquire shares of Hughes Chemical at a price unfair to Atlas and its stockholders.

### The MPA Transactions

Defendant Devaney, elected by Mascolo to the Atlas board, was president and a principal stockholder of MPA Associates, Inc., a Utah corporation ("MPA"). On April 20, 1986, Atlas entered into an agreement with MPA for the sale to MPA of Atlas' oil and gas properties. In exchange for those properties, MPA issued to Atlas a $5,000,000 secured promissory note, and 2,000,000 shares of MPA common stock, representing 31.8% of the MPA shares issued and outstanding after such issuance. It was agreed that until the MPA Note was fully paid, Atlas would receive 40% of the net cash flow from the oil and gas properties attributable to sales of oil and gas in excess of certain specified prices. Plaintiff alleges that, as a result of the MPA transaction, the MPA Note and stock became Atlas' principal assets.

After MPA's acquisition of the oil and gas properties, Devaney discovered that certain Atlas creditors had claims on the cash flow from those properties. MPA did not make the payments to Atlas required by the MPA Note. On June 2, 1987, Devaney and Mascolo reached an agreement which essentially rescinded the MPA Agreement. Mascolo transferred his Atlas stock to Devaney in exchange for shares of an unrelated corporation. The MPA Note was canceled and Atlas transferred its 2,000,000 MPA shares to MPA, all in exchange for a return of the oil and gas properties originally sold to MPA. Devaney and/or his nominees assumed control of Atlas.[10]

### The EXL Transaction

Plaintiff alleges that the Carter group hired EXL, Inc., to find a buyer for the Carter group stock. EXL succeeded in putting the Carter group in contact with Mascolo and his associates. The Mascolo defendants are charged with breach of fiduciary duty in connection with their approval as directors of the payment to EXL of a $100,000 finder's fee in connection with the Stock Exchange Agreement.

### II.

The pending motions are made separately by the Carter defendants and by Mr. Mascolo. Each has moved to dismiss the amended complaint for failure to state a claim upon which relief may be granted and for failure to comply with the demand requirements of Rule 23.1 in circumstances in which demand was not excused. In addition the Carter defendants assert that they cannot, in these circumstances, be properly served with process under the statute that governs service of process upon directors of Delaware corporations.

---

9. The Carter group held the other 13% as a result of the Stock Exchange Agreement and the ISA transaction.

10. Plaintiff alleges that the 1987 agreement to "undo" the MPA transactions violated this court's order of December 18, 1986. That order prohibited Mascolo and Atlas from, among other things, selling Atlas' assets out of the ordinary course of business. The amended complaint alleges that the MPA Note and stock constituted all of Atlas' assets when they were transferred back to MPA in exchange for the oil and gas properties. Plaintiff asks for Mascolo and Devaney to be held in contempt of the December 1986 order. I put this matter to one side for the present.

■ I turn first to the question of the requirement of demand under Rule 23.1, for that topic is raised by both sets of defendants and if determined in their favor will render it unnecessary to address the remaining questions. For the reason that follows, however, I conclude that prior demand upon the board of Atlas was excused at the time the original pleading was filed; that that pleading raised, if it did not denominate as derivative, the claims now brought as derivative claims and that the later amendment to the complaint does not require the plaintiff to initiate the Rule 23.1 procedure, even if it were assumed that the Atlas board at the time of the filing of the amended complaint was capable of exercising a valid business judgment with respect to the question whether the corporation itself should assert these claims. This conclusion is fully consistent with the policy underlying Section 141(a) of our corporation law,[11] for a number of options lie open to a disinterested board in such a circumstance. *See* pp. 230–231.

Thus, concluding that the case is properly pleaded as a derivative claim, I am required to address the further questions whether the Carter group of defendants are properly served and whether a claim is stated against each group of defendants. For the reasons set forth at pp. 232–236, I conclude that the answer to both questions is yes. All pending motions will therefore be denied.

### III.

The original complaint did not purport to be brought derivatively and thus, while it alleges facts relevant to the control of Atlas, it contains no allegation that demand upon the Atlas board to bring suit was excused. The amended complaint was expressed as a derivative action and did contain an allegation that demand upon the board that existed at the time of the filing

of the original complaint was excused. The amended complaint also contained allegations which suggest that a change in board control occurred after the filing of the complaint and that the *betes noires* of the piece, Mascolo and Ager, no longer sat on the Atlas board when the amended complaint was filed. This curious history raises several issues.

The first question is, what is the proper time to measure so-called demand futility[12] where the original pleading does not purport to be brought derivatively: is the proper time to measure demand futility when the original pleading is filed or later when an amended complaint first purports to state from the same facts a derivative claim?

■ Assuming it is, as I conclude, the time of the filing of the original pleading that is relevant, the second question is whether that original pleading in this case includes facts that meet the test of *Aronson v. Lewis*, Del.Supr., 473 A.2d 805 (1984) and other controlling Delaware precedents, even though it plainly lacks a direct allegation concerning demand futility.

If, as I conclude, the original complaint does satisfy that test, the third question is whether the apparent change in board control and the arguable existence of a disinterested board at the time of the filing of the amended complaint establishes a special situation in which an allegation of demand or excuse under Rule 23.1 relating to the time of filing the amended complaint is required.

### A.

There are many cases that hold that the proper time to measure demand futility is at the filing of the complaint. *E.g., Aronson v. Lewis* at 810. They do not directly apply here, for in each of them the complaint purported to institute a derivative

11. "The business and affairs of a corporation ... shall be managed by or under the direction of a board of directors...." 8 *Del.C.* § 141(a).

12. The phrase is convenient but misleading. A demand to sue might be futile because the board is personally interested in the matter or

because, even though it is not, it is apparent that the board will not institute suit for sound reasons. These two types of "futility" would be quite different for Rule 23.1 purposes. I mean to refer only to the first type of futility when I use the phrase.

action and contained an express allegation relating to demand futility. The original pleading here purported to be brought as a class action only. Nevertheless, I conclude that the principle of these cases is applicable. It has been held that the nature of the pleading itself and not the pleader's characterization of the claims determines whether a claim stated is derivative or not. *Lipton v. News International Plc.*, Del.Supr., 514 A.2d 1075, 1078 (1986). The facts alleged in the original complaint—for example, the issuance of Atlas shares in the ISA transaction for no real consideration—attempted to state a corporate claim. The nature of that claim was unaffected by the pleader's characterization of the claim as individual.

### B.

Did the complaint allege facts excusing demand, even though it contained no conclusory allegation that demand was excused? Restated in terms of the applicable legal test, the question becomes whether the facts alleged if true create a reasonable doubt that:

> (1) the directors are disinterested and independent and (2) the challenged transaction was otherwise the product of a valid exercise of business judgment.

*Aronson v. Lewis*, Del.Supr., 473 A.2d at 814. There is inescapably a question of judgment to be made by the trial court in answering such question; what is required is the sound exercise of discretion. *Grobow v. Perot*, Del.Supr., 539 A.2d 180, 186 (1988). Terms like reasonable doubt, for example, help guide judgment but, are not scientific. In making the required judgment no single factor—such as receipt of directorial compensation; family or social relationships; approval of the transaction attacked; or other relationships with the corporation (*e.g.*, attorney or banker)—may itself be dispositive in any particular case. Rather the question is whether the accumulation of all factors creates the reasonable doubt to which *Aronson* refers.

Here I am persuaded that the facts originally alleged do create a reasonable doubt that the challenged transaction would qualify for business judgment protection. The

circumstances alleged, in which the Mascolo group acquired its controlling interest on March 28, 1986, and immediately achieved board approval for a series of very complex transactions that are alleged to have been wasteful, and indeed fraudulent, itself is sufficient to raise a reasonable doubt that the challenged board decisions would qualify for the protection of the business judgment rule. *See Smith v. Van Gorkom*, Del.Supr., 488 A.2d 858 (1985).

### C.

The last question relating to Rule 23.1 is in some respects the most interesting. The amended complaint alleges that Mascolo has sold his Atlas stock and implies that he resigned from the board of directors of the company. That pleading does not allege that at the time of filing the amended complaint demand on the post-Mascolo board would be futile. The question these circumstances raise is—assuming for the purposes of argument that a post-Mascolo board were disinterested with respect to suing the Mascolo group and the Carter group—whether it is necessary, given the change in board make-up, to allege facts excusing demand at the time of the amended complaint, as well as in the original pleading?

The first aspect of this question is why is there any question at all. The *Aronson* test for demand futility, quoted above, focuses upon the apparent availability or not of business judgment protection for the board that approved the "challenged transaction." Whether the pleadings can state a reasonable doubt with respect to that question will not be affected at all by a later change in board composition. Thus, the existence of a new, wholly independent board at the time of the institution of a suit might under the *Aronson* test be thought wholly irrelevant. For this reason *Aronson* has been criticized as focusing the test for futility on the wrong time. *See Starrels v. First National Bank of Chicago*, 870 F.2d 1168, 1174–75 (7th Cir.1989) (Easterbrook, J., concurring).

The *Aronson* test as stated at 473 A.2d 814 does focus upon the board at the time

of the transaction challenged and not exclusively upon the independence, etc. of the board upon whom demand might be made. In most instances, as in *Aronson* itself, the board that approves "the challenged transaction" and the board upon whom a demand could be made is one and the same. *See* 473 A.2d at 810. Plainly the Supreme Court in *Aronson* was focusing on this commonly-occurring pattern when at pp. 814–15, it set forth a test of demand futility that focused on the availability of business judgment rule protection for the board that approved the challenged transaction. This time frame will work well in the vast number of cases since the board that approved the challenged transaction is typically composed of the same individuals as the board that would decide whether to institute suit. In the special case, however, where there is a change in board control between the date of the challenged transaction and the date of suit, it might open the way to error to focus on the board existing at the time of the challenged transaction. What, in the end, is relevant is not whether the board that approved the challenged transaction was or was not interested in that transaction but whether the present board is or is not disabled from exercising its right and duty to control corporate litigation.

 I do not consider that *Aronson* intended to determine that demand under Rule 23.1 upon an independent board that has come into existence after the time of the "challenged transaction" would be excused if the board that approved the challenged transaction did not qualify for business judgment protection. Assuming for present purposes that the Atlas board at the time of the amended complaint was independent, I conclude for the following reasons that the existence of such an independent board is relevant to a Rule 23.1 inquiry, but only with respect to derivative claims not already validly in litigation.

\* \* \*

The authority on this narrow question is scant indeed. In a 1975 *per curiam* opinion the Second Circuit Court of Appeals held that where an amended complaint is filed it is the board of directors as constituted at the date of that pleading that is to be looked to in order to determine whether demand is excused:

> The very purpose of the "demand" rule is to give the derivative corporation itself the opportunity to take over a suit which was brought on its behalf in the first place.

*Brody v. Chemical Bank*, 517 F.2d 932, 934 (2d Cir.1975). No other case squarely addressing the question has been cited or found. I am constrained to express a somewhat different view then that contained in *Brody*.

First, the law need not require compliance with a Rule 23.1 procedure (or in its absence, dismissal of a pending derivative suit) in order to "give the derivative corporation itself the opportunity to take over a suit which was brought on its behalf...." That important interest may be otherwise served.

When a board is comprised of new directors who are under no personal conflict with respect to prosecution of a pending derivative claim, the board may cause the corporation to act in a number of ways with respect to that litigation. It may move the court to take control of the litigation by being re-aligned as a party plaintiff. *In re Penn Central Securities Litigation*, 335 F.Supp. 1026 (E.D.Pa.1971). Or the board may, after deliberation on the matter, move to dismiss the case as not, in the board's business judgment, in the corporation's best interest. *Cf. Joy v. North*, 692 F.2d 880 (2d Cir.1982), *cert. denied*, 460 U.S. 1051, 103 S.Ct. 1498, 75 L.Ed.2d 930 (1983).[13] If the new board is independent and acts in an informed way in good faith its judgment ought ordinarily be respected by the court. *Zapata Corporation v. Maldonado*, Del.Supr., 430 A.2d 779 (1981). Finally, the board may, through a formal

---

**13.** *Joy v. North* actually involves the different and more complex question whether a later decision by a committee of arguably disinterest-ed directors to discontinue a pending derivative suit should be accorded business judgment protection.

understanding or by simply failing to act, allow the representative plaintiff and his counsel to carry the litigation forward. *Cf. Sohland v. Baker,* Del.Supr., 141 A. 277 (1927). These options fully protect the legitimate rights of the board under Section 141(a) to manage the corporation's business and affairs.

Thus, when during the pendency of a derivative litigation there occurs a change in the composition of a board that had been disabled by conflict, and the board as newly constituted is capable of validly exercising judgment concerning that corporate claim, it has sufficient avenues open to it to meet its Section 141(a) responsibilities. There are good reasons not to go further and require that a derivative plaintiff interrupt litigation, when amending his pleading or otherwise, to make a demand upon such a newly constituted board.

Derivative suits are an invention of equity and the conditions that called forth that innovation continue. It is, of course, the case that courts entertaining such actions must exercise caution so that through this device shareholders do not improperly seize corporate powers. *Fleer v. Frank H. Fleer Corporation,* Del.Ch., 125 A. 411 (1924). Rule 23.1 is designed to assist this effort. But that rule and the policy behind it ought not to be so construed as to stall the derivative suit mechanism where it has been properly initiated. When claims have been properly laid before the court and are in litigation, neither Rule 23.1 nor the policy it implements requires that a court decline to permit further litigation of those claims upon the replacement of the interested board with a disinterested one. In that circumstance a new board should be required to take one of the steps outlined above, should it decide to act at all with respect to the matter. As in *Zapata Cor-*

*poration v. Maldonado,* "some tribute must be paid to the fact that the lawsuit was properly initiated." 430 A.2d at 787. Accordingly, in my opinion, such a change in control does not require a derivative plaintiff to present a demand to the new board, or to allege facts that would excuse demand as of the time a plaintiff elects to amend his pleadings.

A rule that recognizes the power to amend or supplement a well-instituted derivative suit without recourse to Rule 23.1, does not acknowledge a shareholder right to institute *new* corporate "claims" against an existing defendant (as might otherwise occur under Rule 18) after a disinterested board takes control of the corporation. Rather it limits the representative plaintiff's ability (without independent justification under Rule 23.1) to amend and supplement pleadings to those that relate to "claims" already in litigation. *See Kaufman v. Beal,* Del.Ch., C.A. No. 6485, Hartnett, V.C., 1983 WL 20295 (February 25, 1983). However, "claim" for these purposes does not refer simply to legal theories of liability but refers broadly to the acts and transactions alleged in the original complaint. *See Restatement (Second) of Judgments,* Title D, Introductory Note and § 24 *et seq.* (1982). Thus, an amendment or supplement to a complaint that elaborates upon facts relating to acts or transactions alleged in the original pleading, or asserts new legal theories of recovery based upon the acts or transactions that formed the substance of the original pleading, would not, in my opinion, constitute a matter that would require a derivative plaintiff to bring any part of an amended or supplemental complaint to the board prior to filing.

Here the amended complaint does not allege new claims in this sense.[14] Thus

---

**14.** Both the original complaint and the amended complaint allege that Atlas purchased shares of Hughes Chemical Corporation stock at a price unfair to Atlas.

Both the original and the amended complaint charge that the sale by the Carter defendants of their controlling Atlas shares to Mascolo constituted a breach of an alleged duty of care to Atlas' minority stockholders. It is further as-

serted in both pleadings that, following Mascolo's acquisition of control of Atlas, he caused the company to enter into a merger transaction with a corporation owned by the Mascolo group at a price unfair to Atlas and its stockholders. One alleged foreseeable effect of the merger was an increase in the percentage ownership of Atlas by the Mascolo group and a corresponding

plaintiff was under no obligation created by Rule 23.1 to make a demand upon the board as then constituted prior to filing that pleading or to allege an excuse for his failure to do so.

### IV.

I turn now to the Carter defendants' motion to dismiss for lack of effective service of process upon them. Such service was effected pursuant to Section 3114 of Title 10, the directors consent statute. No question is raised concerning the mechanics of service of process. The question is whether the statute authorized such service in this instance. That statute provides in pertinent part, as follows:

> (a) Every nonresident of this State who after September 1, 1977, accepts election or appointment as a director ... of a corporation organized under the laws of this State ... shall ... be deemed thereby to have consented to the appointment of the registered agent of the corporation ... as his agent upon whom service of process may be made in all civil actions ... brought in this State, by or on behalf of, or against such corporation, in which such director ... is a necessary or proper party, or in any action a proceeding against such director ... for violation of his duty in such capacity....

Section 3114 has been interpreted to apply only to suits against a director of a Delaware corporation for acts performed in the capacity as a director. *Hana Ranch v. Lent*, Del.Ch., 424 A.2d 28, 30 (1980). *See also Instituto Bancario Italiano v. Hunter Engineering Co.*, Del.Supr., 449 A.2d 210, 228 (1982). Thus, whether service of process on the Carter defendants was proper turns on whether those defendants are charged with committing wrongful acts in a directorial capacity.

 It is true, as the Carter defendants suggest, that a claim against a director relating only to the director's sale of

his personally held stock in the corporation would not satisfy the requirements of Section 3114. Merely selling shares of stock in a company on whose board one sits is not a directorial act within the meaning of the statute. But the complaint in the present case involves more than simply a sale of stock by directors. What is alleged is a negligent transfer of corporate control by the Carter defendants to Mascolo. Two types of acts were undertaken to facilitate the control transfer. First, the Carter defendants sold their controlling Atlas shares to Mascolo in a transaction that contemplated a later merger between ISA and Atlas. Second, those same defendants, as directors, resigned their positions on the Atlas board *in a process designed to assure the appointment of Mascolo and his designees.* Thus plaintiff alleges far more than a simple sale of corporate stock; he complains of action taken in the capacity as a director within the meaning of Section 3114. The consent statute in my opinion, therefore, authorizes service of process on each of the Carter defendants in this action.

### V.

Finally, I turn to the Carter defendants motion to dismiss for failure to state a claim upon which relief may be granted. This motion raises novel questions of Delaware law. Stated generally the most basic of these questions is whether a controlling shareholder or group may under any circumstances owe a duty of care to the corporation in connection with the sale of a control block of stock. If such a duty may be said to exist under certain circumstances the questions in this case then become whether the facts alleged in the amended complaint would permit the finding that such a duty arose in connection with the sale to the Mascolo group and was breached. In this inquiry one applies the permissive standard appropriate for motions to dismiss: if on any state of facts

---

decrease in the percentage of Atlas' equity represented by all other shares.

Newly presented in the amended complaint is the theory that the payment by Atlas of an alleged finder's fee for locating a buyer for the

Carter group's Atlas stock constituted a corporate waste in which both groups of defendants participated. But this matter is sufficiently bound up with the facts originally alleged to constitute a part of the original claim.

that may reasonably be inferred from the pleaded facts plaintiff would be entitled to a judgment, a claim that will survive a Rule 12(b) motion has been stated. *Rabkin v. Philip A. Hunt Chemical Corp.*, Del. Supr., 498 A.2d 1099 (1985); *Delaware State Troopers Lodge v. O'Rourke*, Del. Ch., 403 A.2d 1109, 1110 (1979).

## A.

A number of cases may be cited in support of the proposition that when transferring control of a corporation to another, a controlling shareholder may, in some circumstances, have a duty to investigate the *bona fides* of the buyer—that is, in those circumstances, to take such steps as a reasonable person would take to ascertain that the buyer does not intend or is unlikely to plan any depredations of the corporation.[15] The circumstance to which these cases refer is the existence of facts that would give rise to suspicion by a reasonably prudent person. The leading case is *Insuranshares Corporation*, 35 F.Supp. 22 (E.D.Pa.1940).

In that case defendants, who comprised the entire board of directors of the corporation involved, sold their 27% stock interest in the corporation and resigned as directors. The resignations were done seriatim, in a way that permitted the designation of the buyers as successor directors. The buyers proceeded to loot the corporation.

As here, the sellers contended that they could have no liability for the wrongs that followed their sale. They merely sold their stock and resigned. These were acts that they were privileged to do, they claimed. Judge Kirkpatrick rejected this position:

> Those who control a corporation, either through majority stock ownership, ownership of large blocks of stock less than a majority, officeholding, management contracts, or otherwise, owe some duty to the corporation in respect of the trans-

fer of the control to outsiders. The law has long ago reached the point where it is recognized that such persons may not be wholly oblivious of the interest of everyone but themselves, even in the act of parting with control, and that, under certain circumstances, they may be held liable for whatever injury to the corporation made possible by the transfer. Without attempting any general definition, and stating the duty in minimum terms as applicable to the facts of this case, it may be said that the owners of control are under a duty not to transfer it to outsiders if the circumstances surrounding the proposed transfer are such as to awaken suspicion and put a prudent man on his guard—unless a reasonably adequate investigation discloses such facts as would convince a reasonable person that no fraud is intended or likely to result.

> \* \* \* \* \* \*

> If, after such investigation, the sellers are deceived by false representations, there might not be liability, but if the circumstances put the seller on notice and if no adequate investigation is made and harm follows, then liability also follows.

35 F.Supp. at 25.

This statement represents the majority view on the subject. There is a minority view. Judging from a single fifty year old case, in New York a controlling shareholder may apparently not be held liable in any sale of control setting, other than one in which he had actual knowledge of a planned depredation by his buyer. While in *Gerdes v. Reynolds*, 28 N.Y.S.2d 622, 652–654 (1941) the Supreme Court, Special Term held that a seller of corporate control could be liable for wrongs of his buyer without actual knowledge of his buyer, purpose if he knew facts that should have put

---

15. *See Insuranshares Corporation v. Northern Fiscal Corporation*, 35 F.Supp. 22 (E.D.Pa.1940); *Clagett v. Hutchison*, 4th Cir., 583 F.2d 1259, 1262 (1978); *Swinney v. Keebler Company*, 4th Cir., 480 F.2d 573, 577 (1973); *Estate of Hooper v. Government of Virgin Islands*, 3rd Cir., 427 F.2d 45, 47 (1970); *McDaniel v. Painter*, 10th Cir., 418 F.2d 545, 547–548 (1969). *See also Essex Universal Corporation v. Yates*, 2nd Cir., 305 F.2d 572, 581 (1962) (Friendly, J., concurring); *Seagrave Corp. v. Mount*, 6th Cir., 212 F.2d 389, 395 (1954). *See also Fletcher Cyc. Corp.* § 900, § 5805 (1986).

him on guard, in *Levy v. American Beverage Corp.*, 265 A.D. 208, 38 N.Y.S.2d 517 (1942), the New York Supreme Court—Appellate Division held to the contrary (38 N.Y.S.2d at p. 524–526). That court concluded that a selling majority shareholder could be held to account for the looting of the corporation by his buyer only if he had knowledge of the improper purpose of his buyer.

Although there are few cases applying the principle of the *Insuranshares* case that do fix liability on a seller, it is the principle of *Insuranshares* and not the actual notice rule of *Levy* that has commanded the respect of later courts. In *Swinney v. Keebler Company*, 480 F.2d 573, 577 (1973), the Second Circuit Court of Appeals acknowledged *Insuranshares* as "the leading case." It aptly summarized the principle of that case:

> Liability was predicated upon breach of a duty not to transfer control since the circumstances surrounding the transfer were "such as to awaken suspicion and put a prudent man on his guard—unless a reasonably adequate investigation discloses such facts as would convince a reasonable person that no fraud is intended or likely to result." 35 F.Supp. at 25.

*Swinney v. Keebler Company*, 480 F.2d at 577. The appeals court went on:

> The district court properly rejected the test applied in *Levy v. American Beverage Corp.*, 265 App.Div. 208, 38 N.Y.S.2d 517, 526 (1942), to the effect that, before the transferor can be found liable, it must have actual notice that the transferee intends to loot the corporation. We agree with the district court that "[t]o require knowledge of the intended looting on the part of the seller in order to impose liability on him places a premium on the 'head in the sand' approach to corporate sales," [*Swinney v. Keebler Co.*] 329 F.Supp. [216] at 223, and with Judge Friendly that "[t]o hold the seller for delinquencies of the new directors only if he knew the purchaser was an intending looter is not a sufficient sanction." *Essex Universal Corporation v. Yates*, 305 F.2d 572, 581 (2nd Cir.1962) (concurring opinion).

*Id.* at n. 6. *See also Estate of Hooper v. Government of Virgin Islands*, 427 F.2d 45, 47 (3rd Cir.1970); *McDaniel v. Painter*, 418 F.2d 545, 547 (10th Cir.1969); *Seagrave Corporation v. Mount*, 212 F.2d 389, 395 (6th Cir.1954); *Clagett v. Hutchison*, 583 F.2d 1259, 1262 (4th Cir.1978).

### B.

■ While Delaware law has not addressed this specific question, one is not left without guidance from our decided cases. Several principles deducible from that law are pertinent. First, is the principle that a shareholder has a right to sell his or her stock and in the ordinary case owes no duty in that connection to other shareholders when acting in good faith. *Frantz Manufacturing Co. v. EAC Industries*, Del.Supr., 501 A.2d 401, 408 (1985).

■ Equally well established is the principle that when a shareholder presumes to exercise control over a corporation, to direct its actions, that shareholder assumes a fiduciary duty of the same kind as that owed by a director to the corporation. *Sterling v. Mayflower Hotel Corp.*, Del. Supr., 93 A.2d 107, 109–10 (1952). A sale of controlling interest in a corporation, at least where, as is alleged here, that sale is coupled with an agreement for the sellers to resign from the board of directors in such a way as to assure that the buyer's designees assume that corporate office, does, in my opinion, involve or implicate the corporate mechanisms so as to call this principle into operation.

More generally, it does not follow from the proposition that ordinarily a shareholder has a right to sell her stock to whom and on such terms as she deems expedient, that no duty may arise from the particular circumstances to take care in the exercise of that right. It is established American legal doctrine that, unless privileged, each person owes a duty to those who may foreseeably be harmed by her action to take such steps as a reasonably prudent person would take in similar circumstances to

avoid such harm to others.[16] While this principle arises from the law of torts and not the law of corporations or of fiduciary duties, that distinction is not, I think, significant unless the law of corporations or of fiduciary duties somehow privileges a selling shareholder by exempting her from the reach of this principle. The principle itself is one of great generality and, if not negated by privilege, would apply to a controlling shareholder who negligently places others foreseeably in the path of injury.

That a shareholder may sell her stock (or that a director may resign his office) is a right that, with respect to the principle involved, is no different, for example, than the right that a licensed driver has to operate a motor vehicle upon a highway. The right exists, but it is not without conditions and limitations, some established by positive regulation, some by common-law. Thus, to continue the parallel, the driver owes a duty of care to her passengers because it is foreseeable that they may be injured if, through inattention or otherwise, the driver involves the car she is operating in a collision. In the typical instance a seller of corporate stock can be expected to have no similar apprehension of risks to others from her own inattention. But, in some circumstances, the seller of a control block of stock may or should reasonably foresee danger to other shareholders; with her sale of stock will also go control over the corporation and with it the opportunity to misuse that power to the injury of such other shareholders. Thus, the reason that a duty of care is recognized in any situation is fully present in this situation. I can find no universal privilege arising from the corporate form that exempts a controlling shareholder who sells corporate control from the wholesome reach of this common-law duty.[17] Certainly I cannot read the Supreme Court's opinion in *Frantz, supra,*

as intending to lay down a rule applicable to the question here posed.

Thus, I conclude that while a person who transfers corporate control to another is surely not a surety for his buyer, when the circumstances would alert a reasonably prudent person to a risk that his buyer is dishonest or in some material respect not truthful, a duty devolves upon the seller to make such inquiry as a reasonably prudent person would make, and generally to exercise care so that others who will be affected by his actions should not be injured by wrongful conduct.

■ The cases that have announced this principle have laid some stress on the fact that they involved not merely a sale of stock, but a sale of control over the corporation. Thus, in *Insuranshares,* the agreement that the sellers would resign from the board in a way that would facilitate the buyers immediately assuming office (*see* 35 F.Supp. at 24) was given importance. That circumstance is pleaded here as well.

One cannot determine (and may not on this type of motion determine) whether Mr. Carter and those who acted with him were in fact negligent in a way that proximately caused injury to the corporation. Indeed one cannot determine now whether the circumstances that surrounded the negotiations with Mascolo were such as to have awakened suspicion in a person of ordinary prudence. The test of a Rule 12(b)(6) motion is, as noted above, permissive. It is sufficient to require denial of this motion to dismiss that I cannot now say as a matter of law that under no state of facts that might be proven could it be held that a duty arose, to the corporation and its other shareholders, to make further inquiry and was breached. In so concluding I assume without deciding that a duty of care of a controlling shareholder that may in special

**16.** *See Restatement of Torts Second* § 281; Prosser & Keeton on Torts p. 284–290 (5th Ed.1984); *Palsgraf v. Long Island Railroad Co.,* 248 N.Y. 339, 162 N.E. 99 (1928); *Delmarva Power & Light Company v. Burrows,* Del.Supr., 435 A.2d 716, 718–20 (1981).

**17.** A privilege arguably does exist with respect to foreseeable risk of financial injury to share

values that might arise from a risky though honest future business plan that the buyer may have in mind. Such a privilege would not be involved here when the thrust of the complaint is that Mascolo engaged in—and Carter defendants should have foreseen or at least investigated—dishonest transactions.

circumstances arise in connection with a sale of corporate control is breached only by grossly negligent conduct. *Cf. Lewis v. Aronson,* 473 A.2d at 812.

That Mr. Carter may well have been misled to his own detriment may be a factor affecting the question whether a duty to inquire arose, as Carter might be assumed to be a prudent man when dealing with his own property. But that assumption is essentially evidentiary and can be given no weight on this motion.

For the foregoing reasons the pending motions will be denied.