IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| Arthur V. Belendiuk, derivatively on behalf of Verizon Communications Inc. and Cellco Partnership d/b/a Verizon Wireless,<br><br><br>Plaintiff,<br><br>v.<br><br>Richard L. Carrión, David J. Corning, Lenore Daddona,  Alin D'Silva, James J. Gerace, Kathleen Grillo, M. Frances Keeth, John F. Killian, Robert W. Lane, Mike Lanman, Kyle Malady, Lowell C. McAdam, Daniel S. Mead, Anthony J. Melone, Randal S. Milch, Robert M. Miller, Sandra O. Moose, Joseph Neubauer, Donald T. Nicolaisen, Thomas H. O'Brien, Clarence Otis, Jr., Hugh B. Price, John T. Scott, III, Ivan G. Seidenberg, Francis J. Shammo, Chris Shunk, Rodney E. Slater, John W. Snow, John R. Stafford, John G. Stratton, Ajay Waghray, and Steven E. Zipperstein,<br><br>Defendants,<br><br>-and-<br><br>Verizon Communications Inc. and Cellco Partnership d/b/a Verizon Wireless,<br><br>Nominal Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 9026-ML |

MASTER'S REPORT
(Motion to Dismiss)

Date Submitted:  May 7, 2014
Final Report:  July 22, 2014

Ryan M. Ernst, Esquire and Daniel P. Murray, Esquire of O'KELLY ERNST & BIELLI, LLC, Wilmington, Delaware and Kenneth A. Levy, Esquire, Monroe, New York; Attorneys for Plaintiff.

Blake K. Rohrbacher, Esquire and Susan M. Hannigan, Esquire of RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Attorneys for Nominal Defendant Verizon Communications Inc.

LEGROW, Master

In this double derivative action, a stockholder of Verizon Communications, Inc. ("Verizon") contends that the boards of directors of Verizon and its majority owned subsidiary wrongfully refused his demand that the boards take action to remedy alleged breaches of fiduciary duty and other wrongful conduct by directors and officers of Verizon and the subsidiary. The plaintiff contends that the wrongful conduct caused the subsidiary to pay a substantial fine to the federal government, and also exposed the subsidiary to other potential sanctions, including a loss of its licenses.

After Verizon moved to dismiss the plaintiff's complaint, the plaintiff filed two amended complaints. Notwithstanding those amendments, the complaint and the plaintiff's arguments in opposition to the motion to dismiss demonstrate a fundamental misunderstanding of the standards governing derivative actions. Unable to demonstrate that the board's investigation was conducted unreasonably or in bad faith, the plaintiff instead appears to argue that this Court nonetheless should review the substance of that decision and determine whether the documents the demand committee considered and the witnesses it interviewed were sufficient or "correct." Compounding matters, even if the plaintiff could establish wrongful refusal of the demand by Verizon's board, the plaintiff concedes he has not and cannot allege that demand on the subsidiary's board would be futile, arguing instead that he somehow made a demand on the subsidiary's board, even though the evidence shows otherwise, and even though he is not a stockholder of the subsidiary. Because the plaintiff cannot plead with the necessary particularity sufficient facts to allow him to maintain this action, I recommend that the Court grant Verizon's motion to dismiss the second amended complaint.

1

## I.    Background

The following facts are drawn from the second amended complaint (the "Complaint"), the documents expressly referred to and relied upon in the Complaint,[1] and a handful of documents of which the Court may take judicial notice,[2] giving the plaintiff the benefit of all reasonable inferences.  The plaintiff, Arthur V. Belendiuk, is a stockholder of nominal defendant Verizon.  At the time Belendiuk filed this action, the other nominal defendant, Cellco Partnership d/b/a/ Verizon Wireless ("Verizon Wireless"), was a majority owned subsidiary of Verizon.[3]  The remaining defendants are past and present directors and officers of Verizon and past and present Verizon Wireless employees and members of Verizon Wireless's Board of Representatives (collectively, the "Individual Defendants").[4]

The facts forming the basis for Belendiuk's claims against the Individual Defendants stem from incorrect data charges that Verizon Wireless imposed on some of

---

[1] *E.g.*, *In re Tyson Foods, Inc. Consol. S'holder Litig.*, 919 A.2d 563, 585 (Del. Ch. 2007); *In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *6 n.46 (Del. Ch. July 17, 1998).  These documents include Belendiuk's demand on the Verizon board and the demand committee's response to the demand.

[2] *E.g.*, *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 n.27 (Del. 2004) (court may take judicial notice of the contents of documents required by law to be filed, and actually filed, with federal or state officials, without converting a motion to dismiss into a motion for summary judgment); *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 169 (Del. 2002) (court may take judicial notice of matters that are not subject to reasonable dispute, without converting a motion to dismiss into a motion for summary judgment).  These documents include the FCC Consent Decree and the Final Order and Judgment in the class action litigation.

[3] Verizon Wireless is a Delaware general partnership formed in April 2000.  At the time the action was filed, Verizon owned a 55% interest in the partnership, with Vodafone Group plc ("Vodafone") owning the remaining 45%.  While the litigation was pending, Verizon agreed to purchase Vodafone's interest in Verizon Wireless in a transaction that closed in or around February 2014.  *See* Compl. ¶ 14.

[4] Second Am. Verified Shareholder [sic] Derivative Compl. (hereinafter "Compl.") ¶¶ 15-45.

its customers between 2007 and 2010. In 2009, several news reports suggested that Verizon Wireless routinely charged its cellular phone customers for internet data usage when a customer had not accessed the internet. In September 2009, Verizon introduced a 50kb data "allowance" to prevent data charges for accidental data use, a decision Belendiuk criticizes as insufficient to remedy the problem.[5] On December 4, 2009, the Federal Communications Commission ("FCC") sent a letter of inquiry to Verizon Wireless that posed several questions regarding the data charge issue. On December 18, 2009, Verizon Wireless's Senior Vice President – Federal Regulatory Affairs, Kathleen Grillo, responded to that letter of inquiry. Grillo's response stated that the data charges "apply when a customer launches the Internet browser and then navigates away from the default Mobile Web homepage to sites other than a Verizon Wireless customer care site."[6]

The FCC launched an investigation into the data charge issue in January 2010, and sent a second letter of inquiry to Verizon Wireless in July 2010. On October 28, 2010, Verizon and the FCC entered into a consent decree wherein Verizon stated that its internal investigation had determined that "approximately 15 million pay-as-you-go customers might have been erroneously billed for data usage from November 2007 to October 2010" (the "Consent Decree").[7] In the Consent Decree, Verizon agreed to refund the overcharges, which it estimated to be approximately $52.8 million, to adopt new procedures to prevent similar issues in the future, and to make a series of compliance

---

[5] *See id*. ¶¶ 3, 62-66.
[6] *Id*. ¶ 59.
[7] Aff. of Susan M. Hannigan, Esq. (hereinafter "Hannigan Aff.") Ex. A, ¶ 7.

reports to the FCC.[8] Verizon also made a $25 million "voluntary contribution" to the U.S. Treasury.[9] In return, the FCC agreed that it would not use the facts developed in the its investigation to institute or refer an action against Verizon Wireless concerning the matters that were the subject of the investigation, absent new material evidence showing that Verizon's representations in the consent order were not accurate.[10] Belendiuk contends that, had Verizon Wireless acted "diligently and openly" regarding the data charge issue, it would not have had to pay this $25 million fine.[11] Belendiuk also alleges that Verizon Wireless substantially misrepresented the extent of the overcharges, which Belendiuk believes exposes Verizon Wireless to FCC sanctions, including possible revocation of Verizon Wireless's licenses, as well as reputational harm.[12]

While the FCC investigation was pending, a series of class action lawsuits also were filed on behalf of Verizon Wireless customers relating to the data charge issue. In May 2011, Verizon Wireless entered into an agreement to settle the class action claims, subject to confirmatory discovery by the plaintiffs and their expert. In connection with the settlement agreement, Verizon Wireless agreed to increase the amount of the refunds and credits issued to current and former customers.[13] The claims were dismissed with prejudice in March 2012.[14]

---

[8] *Id*. Ex. A, ¶¶ 7-9.
[9] *Id*. Ex. A, ¶ 10.
[10] *Id*. Ex. A, ¶ 7.
[11] Compl. ¶ 4.
[12] *Id*. ¶ 5.
[13] Hannigan Aff. Ex. D, ¶ 2.2.
[14] *Id*. Ex. G.

4

After Verizon Wireless entered into the Consent Decree, Belendiuk made a series of Freedom of Information Act ("FOIA") requests to the FCC to obtain the documents Verizon Wireless had provided to the FCC. When Belendiuk did not obtain all the information he sought, he filed a petition against the FCC in federal district court in 2012.[15] Verizon Wireless and the FCC disclosed the requested documents in 2013. Belendiuk also made at least two books and records demands under 8 *Del. C.* § 220.

On July 24, 2013, Belendiuk formally demanded (the "Demand") that the Verizon board of directors take legal action against

> "each member of the [Verizon] board, the Board of Representatives of [Verizon Wireless] and senior officers of [Verizon or Verizon Wireless] who have served in any capacities [sic] from November 2007 through October 2010 (or who have participated in FCC compliance after October 2010) and who have engaged in breaches of fiduciary duty, negligence, gross negligence, recklessness, constructive fraud and waste of [c]ompany assets in connection with their activities as directors and officers … ."[16]

The Demand alleged that the directors and officers of Verizon and Verizon Wireless knew or should have known well before June 2009 that customers were complaining about improper data charges on their wireless bills, and that the directors and officers failed to prevent Verizon Wireless from falsely denying the existence of a problem in response to FCC inquiry. The Demand asserted that Verizon and Verizon Wireless concealed the data charge issue, failed to take adequate remedial action, and made misrepresentations to the FCC, all of which resulted in Verizon Wireless paying a $25

---

[15] Compl. ¶ 57.

[16] Hannigan Aff. Ex. I at 1. The Demand collectively defines Verizon and Verizon Wireless as the "Company" and repeatedly refers to the "Company's" response to the FCC and the "Company's" actions to address the data charge. In summarizing the Demand, I have attempted to distinguish, where possible, between Verizon and Verizon Wireless.

5

million fine to the U.S. Treasury. The Demand also alleged that documents showed that Verizon Wireless had represented that it was making a full refund to overcharged customers, but had failed to do so, exposing Verizon Wireless to potential administrative sanctions issued by the FCC.[17]

In response to the Demand, the Verizon board of directors formed a committee of three independent directors to constitute the Demand Committee, which was charged with considering the Demand and recommending what action, if any, the Verizon board should take regarding the claims.[18] In a follow-up communication sent to the Verizon board, Belendiuk expressed concern that the statute of limitations for the claims alleged in the Demand would expire on October 28, 2013. The Demand Committee retained the law firm of Cravath, Swaine & Moore LLP as its counsel and worked to complete its investigation before that deadline.[19] In its letter to Belendiuk responding to the Demand, the Demand Committee summarized its investigation as follows:

> Beginning in September 2013, and at the direction of the Demand Committee, Cravath carried out an extensive review of material related to the inadvertent data charges issue. The material reviewed included all relevant documents produced by Verizon to the FCC, as well as the filings, transcripts and other communications between the parties in the class action litigation that had been brought against the Company relating to the same issues. In addition, we reviewed all publicly available information concerning customer complaints, the FCC investigation and the Consent Decree. Cravath also conducted in-person and telephone interviews of Company employees who had been involved in responding to the customer complaints, working to solve the underlying technical and billing issues or engaged with the FCC during its investigation. On numerous occasions,

---

[17] *Id*. Ex. I at 2-3.
[18] *Id*. Ex. K. The Court may consider Verizon's response to the Demand because it was incorporated by reference in the Complaint. *See supra* note 1.
[19] Hannigan Aff. Ex. K at 1-2.

6

Cravath requested and received additional information and materials from employees at the Company and from the Company's counsel. Throughout this process, the Demand Committee received regular updates from, and provided direction to, Cravath, including during telephonic meetings with the Demand Committee Chair on September 20, 2013 and October 7, 2013, and a telephonic meeting with all members of the Demand Committee convened on October 16, 2013. During these meetings Cravath briefed the Demand Committee on the progress of its investigation and consulted with the Demand Committee regarding the next steps to be taken.[20]

According to Verizon's response to the Demand, Cravath interviewed 19 Verizon employees and reviewed more than 32,000 pages of information. At the October 16 Demand Committee meeting, Cravath reviewed with the committee its investigation to date, the remaining work to be done, and its preliminary findings. Based on that report, the Demand Committee determined that it was unlikely to recommend to the Board that it would need to seek tolling agreements relating to the claims alleged in the Demand.[21] The Demand Committee met again with Cravath on October 24, 2013, for approximately two hours, followed by a meeting the following morning with the entire Verizon board. At the meeting on October 25, the Demand Committee recommended that the board determine that Verizon had no viable claims as alleged in the Demand and that the procedures and controls developed in response to the Consent Decree were reasonable and appropriate. At its meeting, the Verizon board unanimously adopted the Demand Committee's recommendation and rejected the Demand. This result was reported to Mr. Belendiuk in a letter from Cravath dated October 25, 2013.[22] Mr. Belendiuk points out

---

[20] *Id*. Ex. K at 2-3.
[21] *Id*. Ex. K at 3.
[22] *Id*. Ex. K.

that the board meeting lasted approximately 20 minutes and the board issued its recommendation without the benefit of a written report.

Two days before the Verizon board met to consider the Demand and the Demand Committee's recommendations, Belendiuk filed this action alleging wrongful refusal of the Demand. After receiving the October 25 letter, Belendiuk made a books and records demand to inspect the books and records relating to the Demand Committee's investigation and recommendations and the board's refusal of the Demand. The parties agreed to stay this action while Belendiuk inspected certain books and records, which included the minutes of the meetings of the Demand Committee and the board relating to the Demand, the documents provided to, reviewed or relied upon by the committee or the board, resolutions adopted by the board or the committee, and engagement letters regarding Cravath's retention by the Demand Committee.[23] On January 4, 2014, Belendiuk filed an amended derivative complaint, which he later amended a second time in response to Verizon's motion to dismiss. That Complaint is the subject of the present motion.

Belendiuk alleges that the Verizon's board's refusal of the Demand was wrongful for a number of reasons. First, Belendiuk criticizes the retention of Cravath, arguing that the Demand Committee allowed management to instruct and control the scope of Cravath's investigation.[24] Second, Belendiuk contends that Cravath asked the wrong questions, reviewed the wrong documents, and interviewed the wrong people, alleging

---

[23] Compl. ¶ 81.
[24] Id. ¶ 83.

8

that Cravath performed a "perfunctory and superficial investigation" by reviewing only "self-serving documents" that did not address the material questions raised by the Demand, including: (1) whether Verizon Wireless made a full refund to its customers, (2) whether Verizon Wireless made misrepresentations to the FCC, and (3) what actions or inactions by Verizon or Verizon Wireless caused the FCC to demand a $25 million "voluntary contribution" to the U.S. Treasury.[25] Finally, Belendiuk asserts that the Demand Committee and the Verizon board demonstrated a lack of good faith by resting their recommendations and conclusions on oral reports made by Cravath during various board and committee meetings, rather than requiring a written report of Cravath's investigation.[26]

Verizon argues that the Complaint should be dismissed for several independent reasons, namely: (1) Belendiuk is not an adequate derivative plaintiff, (2) Belendiuk has not adequately alleged that the Verizon board wrongfully refused the Demand, (3) Belendiuk has not pled that demand on the Verizon Wireless board would be futile, and (4) the Complaint fails to state a claim under Rule 12(b)(6). Because the second and third arguments independently support dismissal of the Complaint, I have not addressed the issues of Belendiuk's adequacy as a derivative plaintiff or whether the Complaint states a claim under Rule 12(b)(6).

---

[25] *Id.* ¶¶ 85-92.
[26] *Id.* ¶¶ 93-94.

9

**II.      Analysis**

Under Court of Chancery Rule 23.1, a stockholder seeking to pursue a derivative claim on behalf of a corporation must allege with particularity either (1) the efforts made to obtain the action the plaintiff desires from the directors, and the reasons for the plaintiff's failure to obtain the action, or (2) the reasons why such efforts would be futile and should be excused.[27]  Where a plaintiff fails to plead with particularity that demand would be futile or wrongfully was refused, the complaint will be dismissed.[28]  The demand requirement flows from the fundamental premise of Delaware corporate law:  the business and affairs of a corporation are managed by or under the direction of its board of directors.[29]

The demand requirement "is inextricably bound to issues of business judgment and the standards of that doctrine's applicability,"[30] because a board's business judgment not only suffuses standard business decisions but also extends to acceptance or rejection of a stockholder demand.[31]  The demand requirement serves as notice to the board of directors, allowing the board to review the facts and make a determination in its business judgment whether or not the corporation should take remedial action.[32]  In most cases, therefore, it is the board of directors who is empowered to decide whether to bring a

---

[27] Ct. Ch. R. 23.1.
[28] *Haber v. Bell*, 465 A.2d 353, 357, 360 (Del. Ch. 1983).
[29] 8 *Del. C.* § 141(a).
[30] *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984).
[31] *See Aronson*, 473 A.2d at 813; *Good v. Getty Oil Co.*, 514 A.2d 1104, 1106 (Del. Ch. 1986) ("The remedy of derivative action on behalf of the corporation is an encroachment upon the prerogative of the board of directors to manage the affairs of the corporation.").
[32] *See Schick, Inc. v. Amalgamated Clothing & Textile Workers Union*, 533 A.2d 1235, 1240 (Del. Ch. 1987).

claim on behalf of the corporation.[33]  Where, however, a board is not capable of making an impartial business judgment regarding whether to assert a claim, or wrongfully refuses to assert such a claim, a stockholder may be permitted to maintain the action on behalf of the corporation.[34]

### A. Belendiuk has not alleged with particularly that the Verizon board wrongfully refused the Demand

Here, Belendiuk attempted to satisfy the requirements of Rule 23.1 by making the Demand on the Verizon board.  In so doing, Belendiuk waived any argument that the board is interested or lacks independence.[35]  A stockholder who makes a demand on a board "has spent one – but only one – 'arrow' in the 'quiver.'"[36]  If the demand is refused, the stockholder still may meet the requirements of Rule 23.1 by showing that the refusal was "wrongful."  The inquiry, however, is different than that employed by a court assessing whether demand is excused as futile.

When a board refuses a demand, the only issues examined by a Court are the good faith and reasonableness of the board's investigation.[37]  Upon receipt of a demand, a board must determine the best method to inform itself of the facts relating to the alleged wrongdoing and "the considerations, both legal and financial, bearing on a response to the demand."[38]  Any factual investigation the board decides to undertake must be

---

[33] *Lambrecht v. O'Neal*, 3 A.3d 277, 282 (Del. 2010).
[34] *Rales v. Blasland*, 634 A.2d 927, 932 (Del. 1993).
[35] *Rales*, 634 A.2d at 935 n.12; *Levine v. Smith*, 591 A.2d 194, 212 (Del. 1991).
[36] *Grimes v. Donald*, 673 A.2d 1207, 1218 (Del. 1996).
[37] *Levine*, 591 A.2d at 212 (citing *Spiegel v. Buntrock*, 571 A.2d 767, 777 (Del. 1990)).
[38] *Rales*, 634 A.2d at 935.

conducted in good faith.[39] The board must then weigh the alternatives available to it, "including the advisability of implementing internal corrective action and commencing legal proceedings."[40] If a board refuses a stockholder demand, a stockholder has the right to pursue the claims at issue in the demand only if the stockholder can allege with particularity sufficient facts to create a reasonable doubt about the good faith and reasonableness of the board's investigation.[41]

Belendiuk offers a series of allegations that he contends create a reasonable doubt regarding the board's investigation. First, Belendiuk alleges the Demand Committee did not really hire and manage Cravath and instead delegated to Verizon's management the task of overseeing and directing the investigation. Second, Belendiuk seems to argue that the Demand Committee – and by extension the board – failed adequately to inform itself of the material facts underlying the claims raised in the Demand. In support of this allegation, Belendiuk argues that (i) Cravath did not review the correct documents or interview the correct individuals, (ii) Cravath did not provide written materials, such as a written report or summaries of witness interviews, to the Demand Committee or the board, and (iii) the board held a perfunctory meeting to consider the Demand Committee's recommendation, without reviewing any written materials other than draft resolutions refusing the Demand. These allegations are either conclusory and lack the

---

[39] *Id.*

[40] *Id.*

[41] *Levine*, 591 A.2d at 212; *Spiegel v. Buntrock*, 571 A.2d 767, 777 (Del. 1990); *Gatz v. Ponsoldt*, 2004 WL 3029868, at *5 (Del. Ch. Nov. 5, 2004).

requisite particularity to satisfy Rule 23.1, or fail to rise to the level this Court has held sufficient to establish wrongful refusal.

First, Belendiuk's argument that the Demand Committee delegated to Verizon management the task of overseeing and directing Cravath's investigation is not a reasonable inference based on the facts Belendiuk alleges. The only fact Belendiuk alleges in support of this inference is a letter from Cravath to Verizon's corporate secretary indicating that the Demand Committee had retained Cravath and that, in connection with that engagement, Verizon and Cravath had agreed that the terms of the engagement would be as stated in a 2009 letter between Cravath and Verizon. That 2009 letter specified that Cravath's engagement for a special committee investigation was not a general representation of Verizon on other matters and would not create a conflict with Cravath's representation of present or future clients on matters unrelated to the investigation.[42] That letter does not support a reasonable inference that management directed the substance of Cravath's investigation of the Demand. To the contrary, the Complaint and the documents it incorporates by reference indicate that Cravath met with the Demand Committee in person or telephonically on a number of occasions throughout the investigation and received instructions from the Demand Committee regarding the investigation.[43] Although Belendiuk may doubt these statements, he can point to nothing to refute them, other than his own unsupported suspicions, and therefore the Court is

---

[42] Hannigan Aff. Ex. M.
[43] *Id*. Ex. K at 2-3.

13

entitled to assume the truth of those statements, which are incorporated by reference in the Complaint.[44]

Second, Belendiuk criticizes the substance of the investigation Cravath conducted, arguing that the Demand Committee failed to inform itself of all material facts before refusing the Demand, and the Demand Committee's recommendation was adopted by the board without deliberation and without the benefit of any written materials. To show that the board's decision to refuse the Demand was uninformed, Belendiuk must show that the Demand Committee's investigation was grossly negligent, meaning that the Demand Committee or the board acted with reckless indifference or engaged in conduct outside the bounds of reason.[45] This Court repeatedly has held that a stockholder's criticisms regarding the types of documents reviewed or the persons interviewed in connection with an investigation do not rise to the level of gross negligence, because those choices are ones on which reasonable minds may differ.[46] Similarly, this Court has held that there is no requirement that a committee or the board receive a written report before making a determination to refuse a demand.[47] In general, there is no "prescribed procedure" for how a committee should conduct its investigation, and there are circumstances where a committee and the board can reach a conclusion based on oral reports. Given Mr. Belendiuk's concerns regarding the statute of limitations, it was reasonable for the

---

[44] *See, e.g.*, *Mt. Moriah Cemetery v. Moritz*, 1991 WL 50149, at *3 (Del. Ch. Apr. 4, 1991).
[45] *McPadden v. Sidhu*, 964 A.2d 1262, 1274 (Del. Ch. 2008); *Mt. Moriah Cemetery*, 1991 WL 50149, at *4.
[46] *See, e.g.*, *Gatz v. Ponsoldt*, 2004 WL 3029868, at *5 (Del. Ch. Nov. 5, 2004); *Mt. Moriah Cemetery*, 1991 WL 50149, at *4.
[47] *Gatz*, 2004 WL 3029868, at *5 (citing *Levine v. Smith*, 591 A.2d 194, 214 (Del. 1991)).

Demand Committee to eschew the time associated with preparing a written report, and rely on the oral advice of their counsel.[48] Mr. Belendiuk does not point to any unique feature of this investigation that mandated use of a written report.

Mr. Belendiuk's criticisms of the Demand Committee's reliance on Cravath to conduct the investigation and provide its advice is at odds with Section 141(e) of the Delaware General Corporation Law, which provides

> (e) A member of the board of directors, or a member of any committee designated by the board of directors, shall, in the performance of such member's duties, be fully protected in relying in good faith upon the records of the corporation and upon such information, opinions, reports or statements presented to the corporation by any of the corporation's officers or employees, or committees of the board of directors, or by any other person as to matters the member reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the corporation.

Belendiuk makes no attempt to allege that Cravath was not selected with reasonable care or that the matters on which Cravath offered advice were outside its professional competence.[49] Although Belendiuk argues that the Demand Committee should have hired other experts, including someone with expertise in the accounting issues Belendiuk believes are implicated in his Demand, Belendiuk does not allege with particularity that

---

[48] *See* 66 Del. Laws c. 136 (1987) (stating that, under Section 141, directors may rely in good faith on the "written or oral" advice or opinions of professionals or experts selected with reasonable care). Mr. Belendiuk's Demand did not mention any concern about the looming statute of limitations. The Demand was not considered by the Verizon board until its next regularly scheduled meeting on September 4, 2013, at which time the Demand Committee was formed. It was not until September 10, 2013 that Mr. Belendiuk mentioned the statute of limitations issue, leaving Verizon approximately six weeks to investigate and consider the Demand. *See* Hannigan Aff. Ex. K at 1-2.

[49] *See Brehm v. Eisner*, 746 A.2d 244, 262 (Del. 2000) (listing particularized facts a plaintiff might allege to defeat a Rule 23.1 motion to dismiss in a due care case where an expert has advised the board in its decision-making process).

15

the Demand Committee's decision not to retain any additional experts was "reckless" or without the bounds of reason.

The documents incorporated in the Complaint show that the Demand Committee held several meetings to discuss the Demand, including a final meeting lasting more than 2 hours, and that the Demand Committee's recommendation was reported to the full board, who had the benefit of asking questions of the Demand Committee and its counsel.[50] The Demand Committee's counsel reviewed numerous documents and interviewed 19 witnesses, and formed its opinion based on that investigation. There is nothing in the record to indicate that the Demand Committee did not rely on that advice in good faith, or that the board was not in turn entitled to adopt the recommendation of the Demand Committee.

The allegations in the Complaint that Belendiuk contends are sufficient to meet the requirements of Rule 23.1 are strikingly different from the two published decisions in which this Court has found that a plaintiff adequately alleged wrongful refusal of a demand.[51] In the first such case, *Thorpe v. CERBCO, Inc.*, a special committee appointed by the board issued its recommendation to the board, after which the members of the special committee promptly resigned. The board refused to reveal the substance of the investigation, but took no other action in response to the demand. This Court held that, assuming the truth of those allegations, the complaint raised a reasonable doubt

---

[50] Hannigan Aff. Ex. K at 4-5.
[51] *See Seaford Funding Ltd. P'ship v. M&M Assoc. II, L.P.*, 672 A.2d 66 (Del. Ch. 1995); *Thorpe v. CERBCO, Inc.*, 611 A.2d 5 (Del. Ch. 1991).

concerning the board's good faith.[52] Similarly, in *Seaford Fund Limited Partnership v. M&M Associates II, L.P.,* the plaintiffs alleged that a general partner refused demands that the partnership pursue its claims for payments on a promissory note owed by a company owned and controlled by the general partner, and the general partner refused to explain his reasons for failing to pursue the payments. This Court concluded that those particularized allegations created a reasonable doubt that the general partner validly exercised his business judgment in refusing the demand.[53] Although those cases do not represent the only circumstances under which a court might conclude that a demand wrongfully was refused, they illustrate the specificity of the allegations and the egregiousness of the conduct that this Court has found rises to the level of wrongful refusal, and stand in marked contrast to the allegations in the Complaint.

### B. Belendiuk has not pled that demand on the Verizon Wireless board of representatives would be futile.

Even if I concluded that the Complaint alleged particularized facts creating a reasonable doubt that the decision to refuse the demand was the product of the Verizon's board's valid business judgment, Belendiuk cannot maintain this derivative action because he has not alleged – and concedes he cannot allege – that demand on Verizon Wireless's board of representatives would be futile. Although recent decisions of the Delaware Supreme Court and this Court have clarified that a stockholder seeking to maintain a double derivative action on behalf of a *wholly owned* subsidiary need only show that demand is excused at the parent level, those decisions did not alter the

---

[52] 611 A.2d at 11.
[53] 672 A.2d at 72.

requirement that – to the extent Delaware law allows a stockholder of a parent company to pursue a double derivative action on behalf of a *non-wholly owned* subsidiary[54] – the stockholder must show demand futility at the parent level and the subsidiary level.[55]

Accordingly, even if Belendiuk could show that the Verizon board wrongfully refused the Demand, he would not be able to maintain this double derivative action on behalf of Verizon Wireless unless he showed that demand on Verizon Wireless's board of representatives would be futile. To show demand futility, a stockholder must allege particularized facts creating a reasonable doubt that "(1) the directors are disinterested and independent [or] (2) the challenged transaction was otherwise the product of a valid exercise of business judgment."[56] Belendiuk conceded at argument that he could not meet this standard.[57]

---

[54] The Delaware Supreme Court has not addressed squarely the question of whether a parent company's stockholders have the right to maintain a double derivative suit on behalf of a subsidiary in which the parent owns a controlling interest, but not a 100% interest. *See Lambrecht*, 3 A.3d at 283 n.14. The *Lambrecht* court noted that "a handful of jurisdictions" appear to recognize the right of a parent company's stockholders to maintain a double derivative action on behalf of a majority-owned subsidiary, but the *Lambrecht* decision expressly did not address that issue. *See id.* For purposes of this report, I will assume that Delaware law permits a parent company's stockholders to maintain a double derivative action on behalf of a majority-controlled subsidiary.

[55] *See Rales v. Blasland*, 634 A.2d 927, 934 (Del. 1993) ("[a] plaintiff in a double derivative suit is still required to satisfy the *Aronson* test in order to establish that demand on the subsidiary's board is futile."); *Hamilton Partners, L.P. v. Englard*, 11 A.3d 1180, 1206-07 (Del. Ch. 2010) ("[b]ecause the parent corporation determines, through its 100 percent control, whether or not the subsidiary will sue, 'there is no basis in law or logic' to require a separate demand futility analysis at the [wholly owned] subsidiary level. … For this reason, the *Lambrecht* Court repeatedly observed that in a double derivative action involving a wholly owned subsidiary, a stockholder plaintiff only must plead demand futility (or otherwise satisfy Rule 23.1) at the parent level.").

[56] *Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1984).

[57] *Belendiuk v. Carrion*, C.A. No. 9026-ML (May 7, 2014) (TRANSCRIPT) at 39.

Belendiuk instead advances three arguments why he should not be required to show that demand on Verizon Wireless's board of representatives would be futile. First, he argues that, although he named Verizon Wireless as a nominal defendant, this is not really a double derivative action. Second, he argues that because Verizon Wireless now is a wholly owned subsidiary of Verizon, he need not establish demand futility at the subsidiary level. Third, he argues that the Demand – although it only was addressed to Verizon's board – also in substance was directed to Verizon Wireless. Each argument misstates either the record, Delaware law, or both.

Belendiuk's argument that he is not asserting a double derivative claim is difficult to square with his decision to name Verizon Wireless as a nominal defendant, and also demonstrates a fundamental misunderstanding of Delaware law. Belendiuk argues that "[i]t is questionable whether Verizon Wireless is even a necessary party to this litigation," asserting that "it was Verizon that was the principal actor in these events."[58] But the distinction between a derivative action and a direct action, and the attendant determination of who "owns" the claim at issue, rests not on a determination of who principally was involved in the underlying conduct, but rather solely on a determination of "[w]ho suffered the alleged harm – the corporation or the suing stockholder individually – and who would receive the benefit of the recovery or other remedy?"[59] The harm Belendiuk alleges occurred as a result of the conduct he challenges is (a) Verizon Wireless's payment of the $25 million "voluntary contribution," and (b) the

---

[58] Pl.'s Answering Br. in Opp'n to Mot. to Dismiss at 25-26.
[59] *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1035 (Del. 2004).

19

exposure of Verizon Wireless to potential additional sanctions from the FCC. Belendiuk does not argue that Verizon or its stockholders suffered (or will suffer) directly from those harms, nor would such an argument bear weight. Because Verizon Wireless suffered the alleged harm – and would benefit from any recovery in this action – it is Verizon Wireless who owns and controls the claims at issue here, regardless of whether it was Verizon employees, Verizon Wireless employees, or a combination thereof who engaged in the alleged wrongdoing.

Belendiuk next argues that because Verizon Wireless now is wholly owned by Verizon, a showing of demand futility is not necessary at the subsidiary level, citing the Delaware Supreme Court's decision in *Lambrecht v. O'Neal* and this Court's decision in *Hamilton Partners, L.P. v. Englard*. Belendiuk concedes, however, that at the time he made the Demand and filed the original complaint in this action, Verizon Wireless was not wholly owned by Verizon. The question of whether a stockholder has satisfied the requirements of Rule 23.1 is determined at the time the original derivative complaint is filed, without regard for later developments.[60] Accordingly, the fact that Verizon Wireless became a wholly owned subsidiary of Verizon several months after Belendiuk

---

[60] *See, e.g.*, *Cal. Public Emps. Ret. Sys. v. Coulter*, 2002 WL 31888343, at *6 (Del. Ch. Dec. 18, 2002) (although composition of board changed before the filing of amended complaint, the board as constituted at the time the original complaint was filed is the board for purposes of evaluating whether demand is required or excused); *Needham v. Cruver*, 1993 WL 179336, at *3 (Del. Ch. May 12, 1993) ("[t]he disinterestedness of the directors is determined as of the time the original complaint is filed"); *Harris v. Carter*, 582 A.2d 222, 231 (Del. Ch. 1990) ("a change of control [after a derivative complaint is filed] does not require a derivative plaintiff to present a demand to the new board, or allege facts that would excuse demand as of the time a plaintiff elects to amend his pleadings.").

initiated this action is not relevant to the Court's analysis of whether Belendiuk has met the requirements of Rule 23.1.

Finally, Belendiuk argues that – if the Court concludes he must satisfy Rule 23.1 at the subsidiary level – he has done so by making the Demand and showing (he contends) that the Verizon board wrongfully refused that Demand. In other words, Belendiuk concedes he cannot establish demand futility at the Verizon Wireless level, but argues the Court should conclude that the Demand was directed to both Verizon and Verizon Wireless, and that Verizon Wireless's board of representatives wrongfully refused the Demand. This argument suffers at least two fatal flaws. As an initial matter, I can find no case indicating that "wrongful refusal" is a proper inquiry at the subsidiary level in a double derivative action; all the published double derivative cases speak to establishing demand futility at the subsidiary level. This appears consistent with the separate corporate existence and different ownership of a subsidiary. Belendiuk is a stockholder of Verizon, not Verizon Wireless, and presumably could not make a demand on Verizon Wireless. Second, even if I assumed that Belendiuk could make a demand on the Verizon Wireless board of representatives and could satisfy Rule 23.1 by showing the demand wrongfully was refused, Belendiuk's argument that the Demand was made on both companies is not supported by the record. The Demand only was directed to Verizon, not to the Verizon Wireless board of representatives.[61] Belendiuk concedes this point, but argues that this is merely a "technical failing," and that he "effectively made

---

[61] Hannigan Aff. Ex. I (addressing Demand to the corporate secretary of Verizon and demanding that the Verizon Board take legal action against various individuals).

[a] demand on Verizon and Verizon Wireless," because it would not have "made sense" for Verizon Wireless to form a separate demand committee, and therefore making a separate demand on Verizon Wireless would be a "hollow technicality."[62] Again, this argument ignores the separate legal existence of Verizon Wireless and Verizon and glosses over the critical fact that Vodafone owned 45% of Verizon Wireless at the time the Demand was made and the original complaint was filed.[63] Verizon Wireless separately was represented by a board of representatives, and it would not be reasonable to infer that this board, consisting of representatives of both partners, was a mere "hollow technicality," or would have agreed to defer to any determination by Verizon's Demand Committee.[64]

## III.     Conclusion

For the reasons set forth above, Belendiuk cannot satisfy the requirements of Rule 23.1 at either the parent or subsidiary level, and I therefore recommend that the Court dismiss this double derivative complaint with prejudice. This is my final report and exceptions may be taken in accordance with Court of Chancery Rule 144.


/s/ *Abigail M. LeGrow*
Master in Chancery

---

[62] Transc. at 40-41.

[63] Compl. ¶ 14.

[64] *See Beam v. Stewart*, 845 A.2d 1040, 1048 (Del. 2004) ("'conclusory allegations are not considered as expressly pleaded facts or factual inferences.' Likewise, inferences that are not objectively reasonable cannot be drawn in the plaintiff's favor.").