# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| PARK EMPLOYEES' AND RETIREMENT BOARD EMPLOYEES' ANNUITY AND BENEFIT FUND OF CHICAGO, | ) ) ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 11000-VCG |
| | ) | |
| RICHARD M. SMITH, MYRON Z. HOLUBIAK, CHARLOTTE W. COLLINS, SAMUEL L. ROBBINS, STUART A. SAMUELS, GORDON H. WOODWARD, KIMBERLEE C. SEAH, HAI V. TRAN, PATRICIA BOGUSZ, KOHLBERG & CO., L.L.C., KOHLBERG MANAGEMENT V, L.L.C., KOHLBERG INVESTORS V, L.P., KOHLBERG PARTNERS, V, L.P., KOHLBERG TE INVESTORS V, L.P., KOCO INVESTORS V, L.P., and JEFFERIES LLC, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| BIOSCRIP, INC., | ) | |
| | ) | |
| Nominal Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: February 12, 2016
Date Decided: May 31, 2016

Pamela S. Tikellis, A. Zachary Naylor, and Vera G. Belger, of CHIMICLES & TIKELLIS LLP, Wilmington, Delaware; Catherine Pratsinakis, of CHIMICLES &

TIKELLIS LLP, Haverford, PA; OF COUNSEL: Carol V. Gilden, of COHEN MILSTEIN SELLERS & TOLL PLLC, Chicago, Illinois; Richard A. Speirs and Kenneth M. Rehns, of COHEN MILSTEIN SELLERS & TOLL PLLC, New York, New York, *Attorneys for Plaintiff Park Employees' and Retirement Board Employees' Annuity and Benefit Fund of Chicago*.

Stephen P. Lamb and Matthew D. Stachel, of PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, Wilmington, Delaware; OF COUNSEL: Leslie Gordon Fagen, Daniel J. Kramer, and Robert N. Kravitz, of PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, New York, New York, *Attorneys for Defendants Kohlberg & Co., L.L.C., Kohlberg Management V, L.L.C., Kohlberg Investors V, L.P., Kohlberg Partners V, L.P., Kohlberg TE Investors V, L.P., and KOCO Investors V, L.P.*

David C. McBride, Martin S. Lessner, Tammy L. Mercer, and Nicholas J. Rohrer, of YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; OF COUNSEL: Jonathan Rosenberg and William J. Sushon, of O'MELVENY & MYERS LLP, New York, New York, *Attorneys for Defendant Jefferies LLC*.

Gregory P. Williams, Brock E. Czeschin, and Sarah A. Clark, of RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; OF COUNSEL: Jay Lefkowitz, P.C., Joseph Serino, Jr., P.C., and Shireen A. Barday, of KIRKLAND & ELLIS LLP, New York, New York, *Attorneys for Nominal Defendant BioScrip, Inc. and Defendants Richard M. Smith, Myron Z. Holubiak, Charlotte W. Collins, Samuel P. Frieder, David R. Hubers, Richard L. Robbins, Stuart A. Samuels, Gordon H. Woodward, Kimberlee C. Seah, Hai V. Tran, and Patricia Bogusz.*

GLASSCOCK, Vice Chancellor

This case presents a twist on the usual requirement under Rule 23.1 that an individual stockholder intending to bring a suit derivatively on behalf of his corporation first make a demand that the board of directors pursue the cause of action, or demonstrate that the board, as then constituted, would be incapable of acting in the corporate interest, thus excusing demand. In order to properly apply this requirement to the instant facts, I find it helpful to revisit the unique nature of derivative litigation.

Under our corporate model, it is the corporate directors—and not the owners themselves, the stockholders—who control disposition of a corporation's assets. This distinction between ownership and control is, along with limited liability, the essential heart of the corporate form; it allows all the positive wealth-creating attributes of corporations and also is the font of the many agency problems that are litigated in this Court. As with corporate assets in general, so it is with choses in action: potentially valuable assets owned by the corporation, which, generally, the board may pursue or eschew as it finds in the corporate interest.

The concept of derivative litigation is meant to address an exception to this generally beneficent rule: what to do when the directors, because of self-interest, domination, or conflict, are unable to put a litigation asset to its best use on behalf of the corporation. In other words, how can corporate wealth be maximized where the board is incapable of applying its business judgement on behalf of the

1

corporation?

The answer to this conundrum offered by our law is the derivative action, under which a stockholder is permitted to take control of the litigation asset and attempt to employ it on behalf of the corporation. Looked at in this way, derivative litigation is a kind of necessary evil;[1] because it departs from the fundamental tenet that the directors control the corporation and its assets, it must be employed only where the established corporate model cannot exploit, and risks forfeiting the value of, the litigation asset. To ensure that derivative litigation is kept within the appropriate limited confines, our courts, through rules and case law, have established that a stockholder–plaintiff may proceed derivatively, and without a demand on the board of directors, but only where he pleads specific facts raising a reasonable doubt that the directors would be able to bring their business judgment to bear on behalf of the corporation, with respect to the litigation at issue.

Such a showing may take various forms; in the one here at issue, the litigation involves potential liability of the directors themselves. Where there exists a serious threat of personal liability on the part of a director if litigation is pursued, that director's consideration of whether to bring an action for benefit of her corporation is, self-evidently, compromised, and her exercise of business judgment in that matter is therefore unreliable. Such a showing justifies derivative litigation. It is just as

---

[1] *See infra* note 79.

obvious that the pleading requirement in this regard must be rigorous; otherwise, an unsubstantial allegation of potential liability would be sufficient to wrest control of the litigation asset away from the board in favor of the stockholder, with potentially pernicious results for the corporation. A substantial body of case law has thus grown up regarding the sufficiency of allegations of director liability to excuse demand and allow litigation to proceed derivatively. Where such a showing cannot be made, the remedy of a stockholder who believes the corporation is, improvidently, failing to pursue litigation is to make a demand on the board of directors that they bring the litigation; the decision to do so remains with the board.[2]

Where demand is excused, and a stockholder–plaintiff invests effort and expense in pursuit of litigation on behalf of the corporation, the litigation takes on an unusual dual nature. The litigation remains a corporate asset, but it is also an action by a stockholder to force the corporation to act. Equity recognizes that the investment in such litigation comes uniquely from one among potentially many corporate owners, giving that stockholder an equitable interest in the litigation as well; and that policies that raise the stockholder's litigation costs can chill litigation valuable to the corporation as a whole.

The demand-excusal analysis is complicated by the fact that a wrong done by

---

[2] Beyond the scope of this Memorandum Opinion is jurisprudence regarding the effect of the demand and the availability of derivative litigation where demand is wrongfully refused.

directors potentially justifying derivative litigation is a fact fixed in time, while board composition is fluid over time. The question thus arises, when evaluating whether directors can employ their business judgement to evaluate potential litigation, *which* directors must be so evaluated? Consideration of the rationale for derivative litigation, described above, makes the answer—superficially at least—obvious: demand is excused if the directors *who control the asset at the time when demand would otherwise be made*—that is, at the time the derivative litigation is filed—are incapable of exercising appropriate judgment on the corporate behalf. The fact that former directors from whom the current directors are independent[3] may thereby be liable is immaterial to the consideration of demand excusal.

Typically, this rule is of straightforward application; the Court must analyze the ability of the board to appropriately respond to a litigation demand as of the time the suit was filed. As with any equitable rule, however, exceptions arise where equity dictates; equity drives the rule, not the reverse. Consideration of the various interests implicated where board composition changes during the course of litigation must be in light of the dual nature of derivative litigation: both as a corporate asset, which should be managed by the directors, except where circumstances make that unavailing; and as a cause of action pursued by an individual stockholder at his own

---

[3] Of course, whether such independence is real or illusory may itself become an issue in the analysis.

4

expense, to force corporate action in his interest and those of other stockholders. In the latter regard, great mischief could be done if change in board composition could be used by defendants as a tool to raise the cost of appropriate derivative litigation and to deprive the litigant of the benefits of his effort, and mischief could result even if innocent changes to board composition have that result. A court faced with the issue of change in board composition during litigation must recognize that interest, tempered by the understanding that a corporate asset should be administered by the directors elected by the stockholders, free from interference by individual stockholders, except where corporate well-being requires otherwise.

The instant matter alleges corporate wrongdoing involving, among others, directors of BioScrip, Inc. The Plaintiff, a stockholder, appropriately sought information under a Section 220 request from the corporation while evaluating whether to allege that demand on these allegedly faithless directors was excused, and whether to proceed derivatively. At the time the Plaintiff filed this substantive action, however, it was apparent from public documents that the composition of the board of directors would change immanently and in a way that would concern the demand-excusal analysis. The Plaintiff filed a complaint just before this change in composition in fact occurred. It made allegations intended to demonstrate that demand against the allegedly faithless directors would be futile. Before service of the complaint could be made, the anticipated change in board composition took

5

place, such that the majority of the current directors are not the subject of the allegations of the complaint. If the old board is the operative board, I must consider whether demand would be futile; if my demand-excusal analysis must consider the new board, the complaint as pled is insufficient to support a finding of demand futility.

The Defendants have moved to dismiss on, among other grounds, the latter hypothesis. On consideration, I agree that, in these particular circumstances, the Plaintiff must demonstrate demand futility with respect to the new—that is, the current—board of directors. In light of this determination, which involves an application of the Delaware demand requirement to circumstances heretofore unlitigated, I find it appropriate to defer a ruling on the Defendants' motions to dismiss sufficient to allow the Plaintiff an opportunity to consider whether it should move to amend the complaint.[4]

## I. BACKGROUND[5]

### A. The Parties

Nominal Defendant BioScrip, Inc. ("BioScrip" or the "Company") is a publicly traded Delaware corporation that operates nationally in two segments of the

---

[4] Court of Chancery Rule 15(aaa) prohibits amendments to complaints after plaintiffs have unsuccessfully defended a motion to dismiss, but the rule has a good-cause exception.

[5] For purposes of evaluating the Defendants' Motions to Dismiss, the facts are drawn from the well-pled allegations of Plaintiff's Verified Shareholder Derivative Complaint (the "Complaint" or "Compl."), and all documents incorporated by reference therein.

healthcare industry: home infusion services and pharmacy benefit management services.[6] Plaintiff Park Employees' and Retirement Board Employees' Annuity and Benefit Fund of Chicago has been a stockholder of BioScrip since January 2012.[7]

Defendants Richard M. Smith, Myron Z. Holubiak, David R. Hubers, Charlotte W. Collins, Stuart A. Samuels, Samuel P. Frieder, and Gordon H. Woodward were directors of BioScrip at all times relevant to liability (the "Director Defendants").[8] Defendants Patricia Bogusz, Hai V. Tran, and Kimberlee C. Seah, along with Director Defendant Smith, were officers of BioScrip at all relevant times (the "Officer Defendants").[9] I refer to the Director Defendants and Officer Defendants collectively as the "Individual Defendants."

Defendants Kohlberg & Co., L.L.C., Kohlberg Management V, L.L.C., Kohlberg Investors V, L.P., Kohlberg Partners V, L.P., Kohlberg TE Investors V, L.P., and KOCO Investors V, L.P. (collectively, "Kohlberg") are stockholders of BioScrip.[10] Kohlberg beneficially owned approximately 26% of the Company's stock as of 2012, and currently holds just under 3% of the Company's stock.[11] The Plaintiff asserts that Kohlberg was, at all relevant times, a controlling stockholder of BioScrip, exercising actual control over the Company individually and through its

---

[6] Compl. ¶ 31.
[7] *Id.* at 30.
[8] *Id.* at ¶¶ 32–38.
[9] *Id.* at ¶¶ 39–41.
[10] *Id.* at ¶ 42.
[11] *Id.*

7

two board designees, Woodward and Frieder.[12]

Defendant Jefferies LLC ("Jefferies") is a global investment banking firm that was hired by BioScrip to advise the Company in connection with a shelf offering, a secondary offering on behalf of Kohlberg, and a possible sale of BioScrip's pharmacy benefit management services segment or the entire Company.[13]

*B. Factual Overview*

This action concerns three primary areas of alleged misconduct: (1) a kickback scheme related to the Company's sale of a drug called Exjade (the "Exjade Kickback Scheme"); (2) the Individual Defendants' fraudulent concealment of the quick and significant erosion of BioScrip's pharmacy benefit management services segment; and (3) insider trading in connection with two stock offerings in 2013.

1. The Exjade Kickback Scheme

BioScrip derives a substantial portion of its revenue from government-sponsored programs, such as Medicare and Medicaid;[14] accordingly, it is required to comply strictly with the federal Anti-Kickback Statute[15] and its state-law equivalents, which prohibit the receipt of payments from pharmaceutical companies in exchange for recommending a particular drug; and the False Claims Act[16] and its

---

[12] *Id.* at ¶¶ 59–60.
[13] *Id.* at ¶ 43.
[14] *Id.* at ¶ 66. From 2007 to 2012, BioScrip received between 16% and 33% of its total revenue from these programs. *Id.* at ¶ 67.
[15] 42 U.S.C. § 1320a-7b.
[16] 31 U.S.C. § 3729.

state-law equivalents, which impose liability for presenting false claims to government programs (such as Medicare and Medicaid).[17]

Beginning in 2005, BioScrip began marketing a drug manufactured by Novartis called Exjade, which was designed to treat excess iron in the blood.[18] BioScrip was one of only three pharmacies selected to distribute Exjade through a system known as the Exjade Patient Assistance and Support Services network ("EPASS.")[19] For each shipment of Exjade, BioScrip received a $13 "rebate" from Novartis.[20]

By 2007, sales of Exjade began to fall as patients started reporting life-threatening side effects from the drug.[21] The Company knew of these side effects, but—under pressure from Novartis to either improve the Company's refill rates among patients and generate "re-starts" of patients who had discontinued use of the drug, or else risk being dropped from EPASS—the Officer Defendants nonetheless pushed employees to aggressively promote Exjade to customers.[22] These efforts prevailed, and by April 2007, BioScrip had the highest refill and re-start rates in the EPASS network.[23] BioScrip was rewarded with an increased rebate of $20 per

---

[17] Compl. ¶ 68.
[18] *Id.* at ¶ 71.
[19] *Id.*
[20] *Id.* at ¶ 75.
[21] *Id.* at ¶ 76.
[22] *Id.* at ¶¶ 3, 77.
[23] *Id.* at ¶ 81.

shipment.[24] According to the Plaintiff, this violated federal and state law.[25] BioScrip kept accepting such "kickbacks" until the business unit implicated in the Exjade Kickback scheme was sold in May 2012.[26]

In November 2011, a former Novartis sales executive filed a *qui tam* action against Novartis and BioScrip alleging that the Exjade Kickback Scheme violated the Anti-Kickback Statute and Fair Claims Act.[27] This action prompted a joint federal and state investigation by the National Association of Medicaid Fraud Control Units, the Department of Justice ("DOJ"), the Federal Bureau of Investigations, and other state and federal agencies.[28] On September 25, 2012, the DOJ launched an investigation into BioScrip's distribution of Exjade and served BioScrip with a civil investigative demand.[29] The following year, BioScrip received a subpoena from the New York Attorney General's ("NYAG") Medicaid Fraud Unit on July 8, 2013, and a second civil investigation from the DOJ on April 8, 2013.[30] At board meetings held in March and August, 2013, the Director Defendants received updates on the DOJ's civil investigative demands and the NYAG's subpoena.[31]

---

[24] *Id.*
[25] *Id.* at ¶¶ 93, 99.
[26] *Id.* at ¶ 4.
[27] *Id.* at ¶ 85.
[28] *Id.*
[29] *Id.* at ¶ 86.
[30] *Id.* at ¶ 149.
[31] *Id.* at ¶ 145.

The Plaintiff alleges that the Director Defendants failed to make material disclosures regarding the Exjade Kickback Scheme. Though government investigations into the scheme began in 2011, the Director Defendants did not reveal to stockholders any details regarding the investigations until September 23, 2014, nearly three years later.[32]

### 2. The Deterioration of BioScrip's PBM Services Segment

BioScrip's pharmacy benefit management ("PBM") services segment "provides discount cash card programs that allow patients to purchase medications from pharmacies at discounted prices," primarily targeting individuals who are uninsured or underinsured, or whose insurance does not cover certain medications.[33] The segment accounted for roughly 20% and 17% of the Company's business in 2011 and 2012, respectively.[34] Throughout 2012 and 2013, BioScrip told its investors that the PBM services segment was a "high-margin business that provided consistent and steady cash that the Company then invested in the aggressive growth of its infusion business."[35] Without explanation, however, BioScrip announced on September 24, 2013 a downward adjustment by 20% of its 2013 outlook on adjusted EBITDA, due to the deterioration of the PBM services segment.[36]

---

[32] *Id.* at ¶ 8.
[33] *Id.* at ¶ 65.
[34] *Id.* at ¶ 101.
[35] *Id.* at ¶ 102.
[36] *Id.* at ¶ 11.

The Plaintiff asserts that Director Defendants knew in advance of the announcement that the PBM services segment was in decline; the board had been informed by the fourth quarter of 2012 that PBM revenues and profits had fallen substantially.[37] The Defendants were also told that one of the Company's contracts, accounting for 33% of the PBM service segment's revenue, was set to expire in March 2013,[38] and that third-party brokers had reduced their marketing efforts on sales of BioScrip discount drug cards, causing further decline of the PBM services segment's revenues.[39] Rather than disclose the business segment's poor performance, however, the board took steps to conceal the problem, attempting to make the PBM revenue appear flat by cutting costs by an amount equal to the segment's loss in revenue.[40]

In late 2012, the Company retained Jefferies to identify potential buyers of the PBM services segment.[41] When those efforts failed, it retained Jefferies to sell the entire Company; again, no buyers emerged.[42] The Defendants ultimately waited until August 2013 to alert investors to the issues surrounding the PBM services segment.[43]

---

[37] *Id.* at ¶ 104.
[38] *Id.*
[39] *Id.* at ¶ 106.
[40] *Id.* at ¶ 105.
[41] *Id.* at ¶ 110.
[42] *Id.* at ¶¶ 114–15.
[43] *Id.* at ¶ 107.

3. Insider Trading in Connection with the 2013 Stock Offerings

In 2013, after Jefferies attempted, but failed, to find a buyer for BioScrip, Kohlberg demanded that the Director Defendants register a secondary offering to allow it to divest its ownership interest in BioScrip.[44]   According to the Plaintiff, Kohlberg wished to take advantage of the Company's stock price, which was inflated due to the public's ignorance of the true state of the Company's PBM services segment and the litigation resulting from the Exjade Kickback Scheme.[45] Jefferies, although allegedly aware of these undisclosed problems facing the Company, recommended to the board in March 2013 that the Company register a $401 million shelf offering.[46]  The Director Defendants approved the shelf offering that same day, declaring it "in the best interest of the Company" to register the resale of some or all of the common stock of Kohlberg, in an aggregate amount of $201 million (the "Secondary Offering"), and to issue $200 million of new stock on behalf of the Company (the "Primary Offering," together with the Secondary Offering, the "April 2013 Offering").[47]  Kohlberg realized net profits of over $45 million in the April 2013 Offering.[48]

The Director Defendants approved an additional $150-million secondary

---

[44] *Id.* at ¶ 128.
[45] *Id.*
[46] *Id.* at 129.
[47] *Id.* at ¶¶ 130–31.
[48] *Id.* at ¶ 139.

offering to sell the remainder of Kohlberg's BioScrip holdings on August 13, 2013 (the "August 2013 Offering"), just days after BioScrip was served with the subpoena from the NYAG and the second subpoena from the DOJ.[49]  Kohlberg generated an additional $90 million in proceeds through the August 2013 Offering.[50]  Shortly thereafter, Holubiak, Bogusz, and Hubers sold 31,200, 39,687, and 37,600 shares of BioScrip common stock, respectively—again, according to the Plaintiff, to take advantage of BioScrip's then-inflated stock price.[51]

The Plaintiff alleges that by late 2012 or early 2013, the Individual Defendants were aware that:

> (1) Kohlberg had demanded an exit plan; (2) no one was interested in purchasing BioScrip or its declining PBM business; (3) BioScrip was being investigated for defrauding the Government; (4) BioScrip had compliance and regulatory problems; (5) the PBM Services segment was in a continuous free-fall (with revenues dropping by 30% in 2013 and EBITDA dropping by over 70% by year end); and (6) BioScrip desperately needed an alternative source of capital in lieu of revenue from its PBM business to grow its infusion business.[52]

Nonetheless, in November 2012, the board filed its Form 10-Q for the third quarter of 2012, failing to disclose the government investigation into the Exjade Kickback Scheme and that "the Company was already subject to scrutiny or challenge under one or more existing laws," and instead stating that the Company was "in substantial

---

[49] *Id.* at ¶ 151.
[50] *Id.* at ¶ 155.
[51] *Id.* at ¶¶ 166, 168–69.
[52] *Id.* at ¶ 117.

14

compliance with all existing laws and regulations."[53]   In March 2013, the Director

Defendants signed BioScrip's 2012 Form 10-K, again concealing information about

the ongoing governmental investigation and the PBM service segment's decline.[54]

The Plaintiff makes similar allegations concerning the Company's preliminary

prospectus in connection with the April 2013 offering,[55] the Company's Form 10-Q

for the second quarter of 2013,[56] and the Company's registration statement and

prospectus in connection with the August 2013 Offering.[57]

### C. The S.D.N.Y. Action

Once the truth ultimately emerged regarding BioScrip's declining condition,

several federal securities actions were filed and consolidated in the Southern District

of New York on February 19, 2014 (the "S.D.N.Y. Action").[58]   The S.D.N.Y. Action

alleged, among other things, that BioScrip had made false and misleading statements

regarding its compliance with federal and state laws, and that it had failed to disclose

the Exjade Kickback Scheme and resulting government investigation in various SEC

filings and related documents.   As of the time of oral argument on Defendants'

Motions to Dismiss, the parties in the S.D.N.Y. Action had reached a settlement,

---

[53] *Id.* at ¶¶ 118–19.
[54] *Id.* at ¶ 123.
[55] *Id.* at ¶ 141.
[56] *Id.* at ¶ 153.
[57] *Id.* at ¶ 156.
[58] *Id.* at 3; *see In re BioScrip, Inc. Securities Litig.*, No. 13-cv-6922 (S.D.N.Y.).

15

pending approval by the court.[59]

*D. The Section 220 Action*

On August 11, 2014, the Plaintiff made a Section 220 books and records demand, seeking information regarding (1) how the BioScrip board could, in compliance with its fiduciary obligations, allow the Company to be subjected to numerous lawsuits regarding violations of state and federal healthcare law; (2) how the board could allow the Company to engage in illegal activity resulting in a $15 million settlement; (3) the timing and circumstances of the 2013 revision to adjusted EBITDA to reflect the declining value of BioScrip's PBM services segment; and (4) the circumstances surrounding the sale of significant blocks of BioScrip stock by insiders and the Company's April and August 2013 Offerings.

BioScrip began delivering the requested documents in December 2014 after, according to the Plaintiff, months of unnecessary delays by the Company. The bulk of production was completed by February 2015. The Plaintiff followed up with BioScrip in March 2015, enumerating deficiencies in the Company's productions, and the Company objected to several of the issues raised. The Company provided additional documents on May 4, 2015, at which time, according to the Plaintiff, it "became apparent that BioScrip's production was largely concluded and that the Company . . . was delaying its obligation to respond to a stockholder's statutory

---

[59] Oral Arg. Tr. 6:2–4.

16

demand."[60]

   *E. The April 8 Proxy*

   On April 8, 2015, the Company mailed to its stockholders BioScrip's annual proxy, providing notice of an annual meeting of stockholders scheduled for May 11, 2015 (the "April 8 Proxy").[61] The April 8 Proxy disclosed that three of the Company's ten directors would not sit for reelection; that nine nominees (six incumbent and three new) were running unopposed for nine open board seats; and that the board anticipated the re-election of the tenth director, Christopher S. Shackelton, pursuant to a March 2015 securities purchase agreement granting certain preferred stockholders the right to elect one member to the board without the consent of the other stockholders.[62] Ascertainable from the April 8 Proxy was that three non-Defendant directors—upon whom the complaint does not allege demand would be futile—would remain on the board, to be joined by three new and potentially independent directors, which would yield, as of May 11, 2015, a new board with a

[60] Pl's Answering Br. 32–33.

[61] BioScrip Defs' Opening Br., Transmittal Aff. of Sarah A. Clark, Esq., Ex. 1 ("April 8 Proxy"), at 1. The Plaintiff relied, in drafting its Complaint, on "BioScrip's public filings made with the Securities and Exchange Commission." Compl. 2. I thus consider the April 8 Proxy incorporated by reference. *See Freedman v. Adams*, 2012 WL 1345638, at *5 (Del. Ch. Mar. 30, 2012) ("When a plaintiff expressly refers to and heavily relies upon documents in her complaint, these documents are considered to be incorporated by reference into the complaint; this is true even where the documents are not expressly incorporated into or attached to the complaint.") (citation omitted).

[62] April 8 Proxy, at 10 ("[T]he nine nominees who receive the greatest number of votes will be elected to the Board. . . . [T]he following nine persons have been nominated for election to the Board at the Annual Meeting: Charlotte W. Collins, David W. Golding, Michael Goldstein, Myron Z. Holubiak, Yon Y. Jorden, Tricia H. Nguyen, R. Carter Pate, Stuart A. Samuels and Richard M. Smith.").

majority (six of ten) of seats filled by non-Defendant, potentially independent directors.[63]

*F. This Action*

On May 7, 2015, the Plaintiff filed its Verified Shareholder Derivative Complaint (the "Complaint"), asserting six derivative claims. Count I asserts a *Caremark*[64] claim against the Individual Defendants for breach of the fiduciary duties of loyalty and care by failing to oversee BioScrip's operations and compliance with various federal and state laws. Count II asserts a claim against the Individual Defendants for breach of the fiduciary duties of care and loyalty in connection with the alleged federal securities law disclosure violations. Count III asserts a claim against the Director Defendants and Kohlberg for breach of the fiduciary duties of loyalty and care by causing BioScrip to engage in the unlawful 2013 stock offerings. Count IV asserts a *Brophy*[65] claim against Defendants Kohlberg, Frieder, Woodward, Bogusz, Holubiak, and Hubers for insider trading. Count V asserts a claim against Jefferies for aiding and abetting insider trading and the breaches of fiduciary duties in Counts II, III, and IV; and, finally, Count VI echoes Count V as to Kohlberg. The Plaintiff seeks to proceed derivatively on behalf of BioScrip. The Plaintiff did not make a demand on the BioScrip board, which consisted, at the time

---

[63] *Id.*
[64] *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959 (Del. Ch. 1996).
[65] *Brophy v. Cities Serv. Co.*, 70 A.2d 5 (Del. Ch. 1949).

18

of filing, of three non-Defendants—Christopher S. Shackelton, Yon Y. Jorden, and Tricia Nguyen—and the seven Director Defendants. Instead, the Plaintiff pled demand futility, arguing that the majority of the board in place when the Complaint was filed on May 7, 2015 (the "May 7 Board") lacked independence.[66]

As announced in its April 8 Proxy, the Company held uncontested elections on May 11, 2015, just four days after the Plaintiff filed its Complaint asserting demand futility. The elections resulted in the installment of a new board with six of its ten seats filled by directors who were *not* named as Defendants in this action. On the same day, shortly after the elections were completed, three of the incumbent directors unexpectedly resigned; two of those three—Collins and Samuels—are named Defendants in this action. Accordingly, by the end of the day on May 11, 2015, four days following the filing of the Complaint, the board (the "May 11 Board") consisted of seven members, of which only two are named Defendants in this action. The Plaintiff subsequently served the May 11 Board with the Complaint on May 27, 2015, nearly three weeks *after* the election of the new board.

The following chart summarizes the change in the composition of the board between the time this action was filed and the Company was served; the directors who resigned from the May 11 Board on that date have their names struck through:

---

[66] The Plaintiff alleges that seven of the ten members of the May 7 Board lacked independence for various reasons, as detailed in the Complaint, including that each has personal financial culpability in this action and the related federal securities action, and that each has engaged in insider trading.

| May 7 Board | May 11 Board |
|:---:|:---:|
| Hubers ✓ | |
| Woodward ✓ | |
| Frieder ✓ | |
| Collins ✓ | ~~Collins ✓~~ |
| Holubiak ✓ | Holubiak ✓ |
| Samuels ✓ | ~~Samuels ✓~~ |
| Smith ✓ | Smith ✓ |
| Shackelton | Shackelton |
| Nguyen | Nguyen |
| Jorden | ~~Jorden~~ |
| | Golding |
| | Goldstein |
| | Pate |

✓ Director Defendants

The Complaint makes no allegations as to why demand on the five of seven May 11 directors who are not named as Defendants would be futile.

On June 16, 2015, the Defendants filed three Motions to Dismiss (the "Motions"). After full briefing of the Motions, I heard oral argument on January 12, 2016. I asked the parties, following the argument, to submit supplemental memoranda addressing (1) what policy or equity reason, if any, supports analyzing the May 7 Board instead of the May 11 Board for purposes of assessing demand excusal; and (2) what is the appropriate disposition of the motions if I determine that demand excusal must be evaluated by reference to the May 11 Board. The parties completed supplemental briefing on February 12, 2016, at which time the matter was

fully submitted. This Memorandum Opinion addresses the Defendants' Motions.

## II. ANALYSIS

The Defendants move to dismiss Plaintiff's Complaint pursuant to Court of Chancery Rule 23.1, for failure to make a demand, and under Rule 12(b)(6), for failure to state a claim; alternatively, the Defendants move to stay this action pending resolution of the prior-filed S.D.N.Y. Action. Because I ultimately conclude that the proper board for purposes of assessing demand is the May 11 Board, and that the Plaintiff therefore has not sufficiently pled demand futility under Rule 23.1, I need not address the Defendants' other arguments here.

### A. The May 11 Board is the Correct Board for Purposes of Evaluating Demand Futility Under Rule 23.1

Delaware embraces a director-centric model of corporate governance; when presented with allegations of wrongs committed against a corporation and its stockholders, it is the corporation's directors who are entrusted with deciding whether to ultimately pursue claims on behalf of the corporation.[67] Delaware recognizes an exception to this general rule, however, for cases where a corporation's directors—because of self-interest, domination, or conflict—are unable to act in the corporation's best interest. In such cases, a stockholder may bring a derivative suit on behalf of the corporation.

---

[67] 8 *Del. C.* § 141(a) ("The business and affairs of every corporation . . . shall be managed by or under the direction of a board of directors . . . .").

21

Rule 23.1, in deference to Delaware's director-centric model, requires a plaintiff bringing a derivative suit to either make a demand on the corporation's board or to plead specific facts demonstrating a reasonable inference that demand would have been futile.[68] This demand requirement promotes intracorporate dispute resolution[69] and ensures that important business decisions, such as the decision whether to invest a corporation's time and resources in litigation, are made by its board, as is required under Delaware's statutory scheme.[70] Demand futility is assessed under one of two standards articulated by the Delaware Supreme Court in

---

[68] Del. Ch. Ct. R. 23.1 ("The complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the effort."); *see Harris v. Carter*, 582 A.2d 222, 230 (Del. 1990) ("The very purpose of the 'demand' rule is to give the derivative corporation itself the opportunity to take over a suit which was brought on its behalf in the first place.") (citation omitted); *Binning v. Gursahaney*, 2016 WL 2653662, at *2 (Del. Ch. May 6, 2016) (citations omitted) ("The Rule 23.1 demand requirement embodies the principle that a derivative cause of action belongs to a corporation, which is managed by the corporation's board, and allows the 'corporation the opportunity to rectify an alleged wrong without litigation.'") (citation omitted); *In re China Agritech, Inc. S'holder Litig.*, 2013 WL 2181514, at *14 (Del. Ch. May 21, 2013) (citing *Wood v. Baum*, 953 A.2d 136, 140 (Del. 2008) ("A stockholder may not pursue a derivative suit to assert a claim of the corporation unless the stockholder: (a) has first demanded that the directors pursue the corporate claim and the directors have wrongfully refused to do so; or (b) establishes that pre-suit demand is excused because the directors are deemed incapable of making an impartial decision regarding the pursuit of the litigation.")).

[69] *See Aronson v. Lewis*, 473 A.2d 805, 811 (Del. Ch. 1984) ("[T]he demand requirement of Chancery Rule 23.1 exists at the threshold, first to insure that a stockholder exhausts his intracorporate remedies . . . ."), *overruled in part by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

[70] *See In re EZCORP Inc. Consulting Agreement Derivative Litig.*, 2016 WL 197814, at *5 (Del Ch. Jan. 15, 2016) ("[W]hen a corporation suffers harm, the board of directors is the institutional actor legally empowered under Delaware law to determine what, if any, remedial action the corporation should take, including pursuing litigation against the individuals involved.").

22

*Aronson v. Lewis*[71] or *Rales v. Blasband*,[72] depending on the nature of the challenged conduct.[73]

Under either standard, whether demand is excused is typically analyzed with respect to the directors seated as of the date that the complaint was filed,[74] and, in recognition of the dual nature of derivative litigation and the stockholder–plaintiff's investment therein, changes to a board's composition *after* filing of the complaint are generally disregarded.[75] The Plaintiff argues for strict application of this rule—that is, that I should assess demand futility with respect to the May 7 Board, of which seven of ten directors are allegedly conflicted, such that demand would

---

[71] 473 A.2d 805 (Del. 1984).

[72] 634 A.2d 927 (Del. 1993).

[73] *Sandys v. Pincus*, 2016 WL 769999, at *6 (Del. Ch. Feb. 29, 2016) ("To determine whether a plaintiff's demand upon the board would be futile, Delaware courts employ one of two tests. The first, articulated in *Aronson v. Lewis,* requires the plaintiff to plead facts that create a reasonable doubt either that 'the directors are disinterested and independent' or that 'the challenged transaction was otherwise the product of a valid exercise of business judgment.' The *Aronson* test does not apply when 'the board that would be considering the demand did not make a business decision which is being challenged in the derivative suit.' For instance, it will not apply when the board did not undertake a business decision or when a majority of the members that made the challenged decision have been replaced. In such situations, this Court instead applies the *Rales* test, under which plaintiff must create a reasonable doubt that 'the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand' at the time the complaint was filed.") (citations omitted). Fundamentally, both tests address the same question: can the board exercise its business judgment on the corporate behalf?

[74] *See, e.g.*, *In re infoUSA, Inc. S'holders Litig.*, 953 A.2d 963, 985 (Del. Ch. 2007) ("[D]emand is made against the board of directors at the time of filing of the complaint.").

[75] For instance, amendment of a derivative complaint after a change in the composition of the board generally does not require re-evaluation of demand futility. *Fotta v. Morgan*, 2016 WL 775032, at *14 (Del. Ch. Feb. 29, 2016) ("Generally, when claims are already properly before the Court, Rule 23.1 does not require a plaintiff to reevaluate compliance with the rule merely because the composition of the board has changed before the filing of an amended complaint.") (citing *Harris*, 582 A.2d at 231).

23

have been futile. The Defendants, on the other hand, contend that I should assess demand futility with respect to the May 11 Board. They argue that Plaintiff's position not only conflicts with the reality of which board was in place to assess demand futility (as the May 11 Board replaced the May 7 Board just four days after the filing of the Complaint), but also with the policy behind Rule 23.1.

As discussed above, the Court generally evaluates demand futility as of the date of the filing of the complaint, disregarding a superseded board that lacks the power to act—the board in place at the time of the alleged wrongdoing—in favor of the board that would *actually* be tasked with determining whether or not the corporation will pursue the litigation. In most cases, the application of this rule is straightforward, and the appropriate board is the board in place at the time of the filing of the complaint. However, under the facts presented by this case, this consideration weighs in favor of the May 11 Board; here, it was the May 11 Board, not the May 7 Board, that was in a position to *actually* assess the Plaintiff's Complaint. The Plaintiff filed its Complaint on May 7, 2015. Just four days—and two business days—later, the Company held previously disclosed and uncontested elections for its board of directors, immediately following which several incumbent directors unexpectedly resigned. A majority of this *new* board (both before and after the unexpected resignations) was made up of non-Defendant directors who potentially could have evaluated the Plaintiff's Complaint. As a practical matter,

24

even had the May 7 directors received a demand on May 7, 2015, they would not have had time to assess the Complaint in keeping with their fiduciary responsibilities before being replaced by the new members of the May 11 Board.[76] This, coupled with the fact that the Company was not served with the Complaint until May 27, 2015, nearly three weeks later, and *after* the May 11 Board was in place, convinces me that the May 11 Board is the appropriate board for purposes of assessing demand futility.

I so find, notwithstanding the fact that derivative litigation is dual in nature. Derivative litigation is not only an asset of the corporation, but also one in which the individual stockholder pursuing the action has an equitable interest.[77] A stockholder engaged in derivative litigation must expend significant resources, both in time and money, to pursue these claims, and an increase in that expense, all else equal, makes it more likely that valuable litigation will be foregone. Accordingly, the Court generally does not require that a stockholder make a demand or replead demand futility in response to changes to the board's composition, *after* the filing of the complaint. The opposite course could have a chilling effect on derivative

---

[76] *See, e.g.*, *Ironworkers District Council of Philadelphia & Vicinity Retirement & Pension Plan v. Andreotti*, 2015 WL 2270673, at *26 (Del. Ch. May 8, 2015) (board adopted a resolution authorizing a special committee to investigate a stockholder demand *one month after* demand was made on the board, after which the special committee conducted a nine-month investigation).

[77] *See Spiegel v. Buntrock*, 571 A.2d 767, 773 (Del. 1990) ("The nature of the derivative action is two-fold. 'First, it is the equivalent of a suit by the shareholders to compel the corporation to sue. Second, it is a suit by the corporation, asserted by the shareholders on its behalf, against those liable to it.'") (quoting *Aronson*, 473 A.2d at 811).

25

litigation,[78] which provides a benefit to the corporation, in that it allows a channel for wrongs against a corporation to be vindicated where a corporation's directors are unable to do so.[79] However, this interest of the stockholders must be balanced against the benefit of the director-centric model, as described above.[80]

The Plaintiff suggests that should this Court depart from the "date of filing" rule and assess demand with respect to the May 11 Board, it would encourage gamesmanship by boards of directors. It contends that venturing away from a bright-line rule would lead to a "slippery slope of a standard susceptible to manipulation," and "arbitrary Court analyses of various factors such as the number of days before a change in the board, the number of days of notice of a change in the board and adjournment of a meeting to elect the board and so forth."[81] For example, a board—anticipating that a stockholder is on the eve of filing a derivative suit—might, in Plaintiff's view, quickly change its membership by removing conflicted directors, so as to preclude the plaintiff from filing a derivative suit; or, a board might intentionally delay in responding to a Section 220 action in order to buy

---

[78] Not only would such a course be inefficient, but it would potentially encourage companies to repeatedly disturb board membership in order to disrupt ongoing litigation that it considers vexatious.

[79] Since I have described such litigation as a "necessary evil," it is appropriate to point out that, where justified, derivative litigation is "necessary" to prevent loss of a corporate asset, and the "evil" is not the litigation itself, but the circumstances that prevent corporate fiduciaries from fulfilling their duties.

[80] *Zapata Corp. v. Maldonado,* 430 A.2d 779, 787 (Del. 1981) (considering the balancing of these interests).

[81] Pl's Supp. Opening Br. 3.

more time to remove certain conflicted directors. This argument rings hollow. The derivative suit is a device that exists to aid a stockholder in vindicating the corporation's rights, *only where* the board of the corporation, typically entrusted with that responsibility, is not capable of doing so.[82] Only where a manipulation of board composition is employed to discourage meritorious derivative litigation is the matter problematic. I have every confidence that this Court can sniff out and preempt improper manipulation of board composition in this context. The fear of gamesmanship falls well short, in my mind, of justifying indulgence in the fiction that the May 7 Board would be the body charged with evaluating a demand here.

The Plaintiff's real argument here is simply that Delaware case law has established a "firm," bright-line rule that demand must be assessed as of the day of the filing of a complaint.[83] But it is axiomatic that equity "regards substance rather

---

[82] *See Schoon v. Smith*, 953 A.2d 196, 202 (Del. 2008) ("The stockholder does not bring such a suit because *his* rights have been *directly* violated, or because the cause of action is *his,* or because *he* is entitled to the relief sought; he is permitted to sue in this manner *simply in order to set in motion the judicial machinery of the court . . . .* In fact, the plaintiff has no such *direct* interest; the defendant corporation alone has a direct interest; the plaintiff is permitted, notwithstanding his want of interest, to maintain the action *solely to prevent an otherwise complete failure of justice.*") (emphasis in original) (citation omitted).

[83] *See* Pl's Supp. Opening Br. 3–5 (citing *Braddock v. Zimmerman*, 906 A.2d 776, 786 (Del. 2006) (citing *Harris*, 582 A.2d at 231 (finding that "when during the pendency of a derivative litigation there occurs a change in the composition of a board . . . [, t]here are good reasons not to go further and require that a derivative plaintiff interrupt litigation, when amending his pleading or otherwise, to make a demand upon such a newly constituted board")); *Rales*, 634 A.2d at 934 ("Thus, a court must determine whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand.") (emphasis added); *Zapata*, 430 A.2d at 787 (finding that "some tribute must be paid to the fact that the lawsuit was properly initiated"); *China Agritech*, 2013 WL 2181514, at

than form";[84] a court of equity generally does not favor bright-line rules, instead using its discretion to make decisions on a case-by-case basis.[85]  Here, I do not disturb the general rule—that demand should be assessed as of the date a complaint is filed.  I find that, under the unique facts presented by this case, a departure from the general rule is both equitable and in keeping with the policy behind Rule 23.1.

---

*13 (assessing demand futility as of the date the complaint was filed); *In re infoUSA, Inc.*, 953 A.2d at 985 ("First and foremost, it is important to remember that demand is made against the board of directors at the time of filing of the complaint.  It is that board, and no other, that has the right and responsibility to consider a demand by a shareholder to initiate a lawsuit to redress his grievances."); *Needham v. Cruver*, 1993 WL 179336, at *3 (Del. Ch. May 12, 1993) ("The disinterestedness of the directors is determined as of the time the original complaint is filed.") (citing *Harris*, 582 A.2d at 231); *In re Fuqua Indus., Inc. S'holder Litig.*, 1997 WL 257460, *13 (Del. Ch. May 13, 1997) ("The appropriate test, therefore, is whether the board in existence at the time the complaint is filed is able to properly carry out its fiduciary duty to evaluate demand in a disinterested and independent fashion.")).

[84] *In re EZCORP, Inc. Consulting Agreement Derivative Litigation.* 2016 WL 301245, at *9 (Del. Ch. Jan. 25, 2016), *reconsideration granted in part*, (Del. Ch. Feb. 23, 2016), *and appeal refused sub nom. MS Pawn Corp. v. Treppel*, 133 A.3d 560 (Del. 2016), *and appeal refused sub nom. Roberts v. Treppel*, 133 A.3d 560 (Del. 2016) (quoting *Monroe Park v. Metropolitan Life Ins. Co.*, 457 A.2d 734, 737 (Del. 1983) (citation omitted)).

[85] The Court, in other contexts, has expressed a preference for fact-specific inquiry over the employment of firm, bright-line rules.  *See, e.g.*, *Nixon v. Blackwell*, 626 A.2d 1366, 1381 (Del. 1993) (explaining that the "doctrine of entire fairness does not lend itself to bright line precision or rigid doctrine"); *Sandys*, 2016 WL 769999, at *9 (explaining Delaware law's requirement of "a case-by-case fact specific inquiry based on well-pled factual allegations" to assess the independence of directors) (quoting *Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 119 A.3d 44, 61 (Del. Ch. 2015); *In re Ancestry.com Inc. S'holder Litig.*, C.A. No. 7988-CS, at 223 (Del. Ch. Dec. 17, 2012) (TRANSCRIPT) ("Per se rulings where judges invalidate contractual provisions across the bar are exceedingly rare in Delaware, and they should be.  It's inconsistent with the model of our law."); *Hamilton Partners, L.P. v. England*, 11 A.3d 1180, 1200 (Del. Ch. 2010) ("[T]he question of whether a related corporation is an indispensable party to a derivative, double derivative, or multi-derivative action should not be answered by rote adherence to a bright-line rule of dubious origin.  It should rather turn on the facts of the case and the standards set forth in Court of Chancery Rule 19(b)."); *Rapoport v. Litig. Trust of MDIP Inc.*, 2005 WL 3277911, at *2 (Del. Ch. Nov. 23, 2005) (explaining that the Court does not perform *McWane* first-filed analyses "mechanically or using a bright-line test," but rather conducts "a more nuanced analysis").

28

Assessing demand futility with respect to the May 11 Board, which was installed just four days after the filing of the Complaint and was the body on which that Complaint was served, does not unduly interrupt the litigation, which was the primary concern of the court in the cases relied upon by the Plaintiff.[86] As discussed above, even had the Plaintiff made a demand on the May 7 Board, it would not, practically, have had the opportunity to evaluate the Complaint before the installment of the new May 11 Board.

While no court has decided this exact issue,[87] the Defendants rely on *In re Puda Coal, Inc. Stockholders Litigation*,[88] in which the Court did look to events *after* the filing of the complaint, as I do here, and refused to evaluate demand futility as of the date that the complaint was filed. At time the original complaint was filed in *Puda Coal*, the board consisted of five directors, three of whom were independent and were charged with investigating potential wrongdoing—theft of corporate

---

[86] *See, e.g.*, *Braddock*, 906 A.2d at 785 ("Rule 23.1 'ought not to be so construed as to *stall the derivative suit mechanism* where it has been properly initiated' or 'to interrupt ligation.'") (emphasis added) (citation omitted); *Harris*, 582 A.2d at 231 ("There are good reasons not to go further and *require that a derivative plaintiff interrupt litigation*, when amending his pleading or otherwise, to make a demand upon such a newly constituted board.") (emphasis added).

[87] The Court faced, but did not decide, a similar issue in *In re EZCORP, Inc. Consulting Agreement Derivative Litigation.* There, the plaintiff filed a derivative complaint, without having first made a demand on the company's board, around 3:00 p.m. on July 28, 2014. Approximately one hour later, the company issued a press release announcing that the board had been expanded from four to seven directors. The Court used the *new* board for purposes of evaluating demand futility, though it remarked that, "[i]n the abstract, which board to use raises a nice doctrinal question," and determined that it need not answer that question, because demand was futile either way. *EZCORP*, 2016 WL 301245, at *34 n.32.

[88] *In re Puda Coal, Inc. S'holders Litig.*, C.A. No. 6476-CS (Del. Ch. Feb. 6, 2013) (TRANSCRIPT).

assets—by the other two directors.[89]  Over the next ten months, all three of the independent directors and one of the allegedly conflicted directors resigned, leaving the company under the control of the sole remaining director, who was the "principal suspected wrongdoer in control of the company."[90]  Two of the independent directors, who had resigned in lieu of pursuing the action on behalf of the corporation, then moved to dismiss the complaint pursuant to Rule 23.1, arguing that because three of five directors on the board at the time the complaint was filed were independent, the plaintiffs should have made a demand.

The court, while recognizing that a majority of the board *was* independent and disinterested at the time the complaint was filed (such that demand would not have been futile), nonetheless denied the motion to dismiss.  The court looked to the reality before it—that granting the motion would leave control of the litigation in the hands of the sole remaining director of the company, the chairman who had allegedly misappropriated the company's funds—and found that application of the general rule of assessing demand futility as of the date of filing would lead to an absurd, "Kafkaesque" result,[91] and that the court should not permit defendants to "use

---

[89] Verified Consol. S'holder Deriv. Compl. ¶ 31, *In re Puda Coal, Inc. S'holders Litig.*, C.A. No. 9640-CS (Del. Ch. Oct. 12, 2011), Trans. ID 40311660; *In re Puda Coal, Inc. S'holders Litig.*, C.A. No. 6476-CS, at 15:21–24, 16:1–5 (Del. Ch. Feb. 6, 2013) (TRANSCRIPT).
[90] *In re Puda Coal, Inc. S'holders Litig.*, C.A. No. 6476-CS, at 6:16–17 (Del. Ch. Feb. 6, 2013) (TRANSCRIPT).
[91] *Id.* at 17:4.

30

doctrinal law in some sort of gotcha way."[92]

While the facts here are very different from those in *Puda Coal*, the same Kafkaesque quality would attach to a decision that the superseded May 7 Board, rather than the May 11 Board actually served with the Complaint, is the appropriate body to which a demand futility analysis must apply. The Defendants accuse the Plaintiff of gamesmanship in the timing of the filing of the Complaint, but I need not find such gamesmanship to note that the Plaintiff filed the Complaint after the April 8 Proxy made it known that the board's composition was about to change, nor to note that this fact does not make the Plaintiff's position particularly sympathetic to equity.

Finally, I find unavailing the Plaintiff's argument that, because the May 11 Board retained the opportunity to "control the litigation" (i.e., to decide whether to file a motion to dismiss the action), no policy reason exists to analyze demand futility here, since in any event the May 11 Board retains control of the corporate asset. Aside from potentially proving too much,[93] this argument is unpersuasive; the power to resist a lawsuit, by moving to dismiss on the ground that the complaint fails to state a claim, falls far short of the plenary authority over litigation assets a board

---

[92] *Id.* at 15:19–20.
[93] Taken to its logical conclusion, under Plaintiff's view, corporate directors will always retain some control of derivative litigation, and the demand requirement is essentially meaningless or unnecessary.

wields if the Court determines that demand is not excused.

*B. Disposition of Defendants' Motions to Dismiss*

Having decided that the May 11 Board is the proper board for purposes of assessing demand futility, I must now determine the proper disposition of Defendants' Motions to Dismiss. The Defendants seek a dismissal with prejudice, noting that such a dismissal would not preclude a subsequent complaint alleging that demand on the May 11 Board is futile. The Plaintiff argues that, on the record presented, I should find demand against the *May 11 Board* is futile, and deny the motion to dismiss. Such a finding, however, would be entirely unsupported by the allegations in the Complaint. In the alternative, the Plaintiff urges me to allow it to amend its Complaint and replead demand futility as to the May 11 Board. Such an allowance would require demonstration of "good cause" under Court of Chancery Rule 15(aaa); the Plaintiff suggests such cause is present here in light of the unusual nature of the facts.

I find it appropriate to consider any request to amend upon motion made, and in light of opposition to the motion, if any. The Plaintiff may elect to make such a motion within 30 days of this Memorandum Opinion, and I reserve decision on Defendants' Motions to Dismiss to allow the Plaintiff to do so as it finds appropriate.

### III. CONCLUSION

For the foregoing reasons, I find that the Plaintiff has failed to demonstrate

32

demand futility under Rule 23.1, and that the matter may not proceed as pled. I reserve decision on the Motions to Dismiss. The parties should confer and inform me how they wish to proceed, should the Plaintiff elect to seek leave to amend the Complaint.